**UNITED STATES of America, Appellee,**

v.

**Roberto José MALDONADO–RIVERA, Antonio Camacho–Negron, a/k/a "Roco", Juan Segarra–Palmer, a/k/a "Papo", a/k/a "Junior", Norman Ramirez–Talavera, a/k/a "Pedro", Defendants–Appellants.**

**Nos. 687 to 690, Dockets 89–1305, 89–1321–89–1323.**

United States Court of Appeals, Second Circuit.

Argued March 15, 1990.

Decided Dec. 12, 1990.

Albert S. Dabrowski, Executive Asst. U.S. Atty., John A. Danaher, III, Asst. U.S. Atty., Hartford, Conn. (Stanley A. Twardy, Jr., U.S. Atty., D. Conn., New Haven, Conn., Carmen Espinosa Van Kirk, Leonard C. Boyle, Asst. U.S. Attys., Hartford, Conn., on the brief), for appellee.

Michael E. Deutsch, Chicago, Ill., for defendant-appellant Roberto José Maldonado–Rivera.

Linda A. Backiel (Daniel R. Williams, New York City, on the brief), for defendant-appellant Antonio Camacho–Negron.

Leonard I. Weinglass, Daniel R. Williams, New York City, for defendant-appellant Juan Segarra–Palmer.

Juan R. Acevedo, Hato Rey, P.R. (Daniel R. Williams, New York City, on the brief), for defendant-appellant Norman Ramirez–Talavera.

Before KEARSE, CARDAMONE, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Roberto José Maldonado–Rivera ("Maldonado"), Antonio Camacho–Negron ("Camacho"), Juan Segarra–Palmer ("Segarra"), and Norman Ramirez–Talavera ("Ramirez") appeal from judgments entered in the United States District Court for the District of Connecticut after a jury trial before T. Emmet Clarie, *Judge*, convicting them principally on one count of conspiracy to commit bank robbery and transport the proceeds in interstate and foreign commerce, in violation of 18 U.S.C. §§ 371, 659, 2113, and 2314 (1988) (count 16). In addition to the conspiracy count, Camacho was convicted on one count of transporting stolen money in foreign commerce, in violation of 18 U.S.C. §§ 2314 and 2 (1988). Segarra was convicted on four counts of aiding and abetting the robbery of a federally insured bank, in violation of 18 U.S.C. §§ 2113(a) and 2; one count of aiding and abetting a theft from an interstate shipment, in violation of 18 U.S.C. §§ 659 and 2; three counts of transporting stolen money in interstate and foreign commerce, in violation of 18 U.S.C. §§ 2314 and 2; one count of obstructing interstate commerce through robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1988), and 18 U.S.C. § 2; and one count of conspiring to obstruct interstate commerce through robbery, in violation of 18 U.S.C. § 1951.

Ramirez and Maldonado, convicted only of the conspiracy charged in count 16, were sentenced principally to five years' imprisonment. Camacho was sentenced principally to consecutive prison terms of five years and 10 years, respectively, on his conspiracy and foreign transportation convictions. Segarra was sentenced principally to a total of 65 years' imprisonment: four concurrent 20–year terms on the § 2113(a) robbery counts; to be followed by 10 years on

the § 659 interstate theft count; to be followed by three concurrent 10–year terms on the § 2314 money transportation counts; to be followed by two concurrent 20–year terms on the Hobbs Act counts; to be followed by five years on the § 371 conspiracy count (count 16). Segarra was also ordered to pay fines totaling $500,000.

Defendants jointly or individually make numerous arguments on appeal, including (1) challenges to the district court's refusals to suppress surveillance tapes, post-arrest statements, and eyewitness identification, (2) claims of erroneous evidentiary rulings, (3) challenges to the trial court's instructions to the jury with respect to the count 16 conspiracy, (4) challenges to venue, and (5) claims of improper sentencing. The government concedes that it was error to sentence Segarra on both the § 659 count and the Hobbs Act substantive count, and we accordingly vacate Segarra's § 659 conviction. In all other respects we affirm the defendants' convictions.

## I. BACKGROUND

The present prosecution arises out of the September 1983 robbery of a Wells Fargo depot in West Hartford, Connecticut. A total of $7,017,151.98 was stolen. Most of this sum belonged to four banks located in Connecticut or Massachusetts, all of which were federally insured. In October 1984, a Puerto Rican independence group calling itself "Los Macheteros" ("the machete wielders") claimed responsibility for the robbery.

Following a lengthy investigation that included extensive physical and wire surveillance and the execution of numerous search warrants, more than 15 persons, including Segarra, Ramirez, Maldonado, and Camacho, were arrested and charged in connection with the robbery. The government proceeded to trial first against these four and one other. The evidence at trial was presented principally through (1) surveillance tapes made by the Federal Bureau of Investigation ("FBI"); (2) the testimonies of (a) Kenneth Cox, an old friend of Segarra, and (b) unindicted coconspirator Anne Gassin, a girlfriend of Segarra; and

(3) various documents, including telephone toll records, a Los Macheteros' communiqué claiming credit for the robbery, and documents written by and seized from one or another of the alleged coconspirators. The evidence, taken in the light most favorable to the government, showed the following.

### A. The Planning and Execution of the Robbery

Gassin testified that she first met Segarra in the late summer or early fall of 1983. When she next met him in May 1984, he apologized for not remembering her, telling her that the late summer of 1983 had been a very busy and engrossing time for him. Gassin soon entered into an intimate relationship with Segarra, and in the summer of 1984, they took a vacation during which he gave her a manuscript he had written, telling her it was an accurate account of the events surrounding the September 1983 Wells Fargo robbery.

According to this evidence, prior to August 1983 Segarra met Victor Gerena, a Wells Fargo guard who described in detail the routes he followed and the amounts of money he transported; Gerena told Segarra he was willing to do something for their cause or their organization. Segarra and Gerena traveled to Puerto Rico where Gerena "learn[ed] about the island, the history and the independence movement and who the members of the organization were and what their objectives were." The members of the organization agreed to a plan whereby Gerena would subdue the other guards, at which point other members of the organization would seize the money. Gerena would escape by motorcycle and later be transported out of the country to remain in hiding. Documents revealed that codefendant Filiberto Ojeda–Rios, whose title was "First Person In Charge" of Los Macheteros operations outside of Puerto Rico, purchased a motorcycle in Massachusetts near the time of the robbery.

Telephone toll records revealed numerous calls between March and September 1983 from Segarra's home in Puerto Rico

to Gerena's home in Hartford, and from a pay phone near Segarra's home to Gerena's home and to a pay phone near Gerena's home. A compendium of documents seized at the home of Maldonado included July 1984 notes authored by "Jr.," a code name for Segarra; the notes discussed "AB," short for "Aguila Blanca," a code name for the Wells Fargo robbery and its aftermath. Segarra's notes stated, "I was assigned the planning and organization of AB and I leave on August 3, 1983. After doing the task, I return on September 30."

Cox testified that he was recruited by Segarra in August 1983 to assist in what Segarra predicted would be "one of the biggest robberies in the United States." Cox asked to be paid part of the proceeds but was persuaded to "[d]o it for the revolution." On the night of August 29, 1983, Cox was to wait at a McDonald's restaurant in Hartford from 7 to 10 p.m. for one of the robbery participants, whom Cox was then to take to Boston. On that evening, Cox arrived at the McDonald's at about 6:40 p.m. and waited as instructed. Just before 7 p.m., Segarra stopped by briefly with another man, whom he admonished to remember the color of Cox's car, and told Cox this was the man who would arrive later to be taken to Boston. Cox waited as instructed, but no one returned because the robbery did not take place that night.

The robbery took place on the night of September 12, 1983, after Gerena and another guard, Timothy Girard, returned to the Wells Fargo depot in West Hartford to unload money picked up on their regularly scheduled run. Gerena held a gun on Girard and the depot supervisor, and he bound, gagged, and blindfolded them. He then loaded the money from the vault into a rented car and departed.

Gerena was met after the robbery by Segarra, who helped him to escape to Springfield, Massachusetts, by motorcycle. From Springfield, Gerena was taken to Boston, and later that month he was transported, along with a portion of the proceeds of the robbery, to Mexico in a motor home. At the time of trial, Gerena remained at large.

## B. *The Movement of the Proceeds of the Robbery*

The stolen money was taken to Springfield by car. Segarra later told Cox that a Winnebago-type vehicle was then used to transport the money to Mexico. Documentary evidence showed that Ojeda–Rios and Segarra had purchased such a vehicle four days after the robbery. Segarra told Cox that the purpose of the Wells Fargo robbery had been to fund the activities of Los Macheteros.

### 1. The March 1984 Money Move

In March 1984, approximately $2 million more of the stolen Wells Fargo money was taken to Mexico in the same motor home, driven by members of the Macheteros organization. Several members of Los Macheteros, including codefendant Avelino Gonzalez–Claudio, organized this transport. On March 22, a member of this team, observed by FBI agents, flew from Puerto Rico to New York City and was met at the airport by Avelino Gonzalez–Claudio and two others. An April 1984 letter authored by Avelino Gonzalez–Claudio, a copy of which was seized from the home of Maldonado, described this phase and noted, *inter alia*, that this team had contacted Segarra so that he could deliver the money to them for transport.

In a July 13, 1984 conversation taped by the FBI, a transfer of the rest of the money was planned. At that time, Segarra advised or reminded Ojeda–Rios how much had been transferred in March (approximately "two million twenty-four"), and how much remained:

> SEGARRA: .... It's not three, it's not three million. It's not three million. Because there was, two million plus were sent the last time, two million twenty-four, if I'm not mistaken. That means there is two million nine hundred sixty plus left....

### 2. The September 1984 Money Move

Virtually all of the remaining proceeds of the Wells Fargo robbery, apparently about $2,960,000, were removed from the main-

land United States in September 1984. Originally, this transfer was to be carried out in August by a non-Hispanic couple driving a pick-up truck with a camper trailer attached. When one of the couple had health problems, the plan was changed. Segarra, Camacho, and another codefendant began the drive; Gassin and codefendant Paul S. Weinberg were recruited to fly to Texas, and from there to drive the truck and trailer into Mexico. This second plan too aborted, however, when the truck and trailer overturned on a Pennsylvania highway. Weinberg received an S.O.S. call from Segarra and went to help him and the others bring the money back to Boston.

In mid-September, Segarra purchased a motor home for another attempt to move the money to Mexico. Part of the preparation of this motor home for concealment of the money took place behind Gassin's house in Boston. Camacho, who Segarra described as skilled and experienced in that kind of work, came to Massachusetts from Puerto Rico for that purpose. Camacho removed the vehicle's interior panels, stashed the money inside, and replaced the panels. As discussed in greater detail in Part V.C.2. below, Gassin identified Camacho at trial.

After the money was hidden in the mobile home, Segarra, Camacho, and an unidentified woman who had arrived from Puerto Rico, drove the money to Mexico. Prior to crossing the border on September 23, the group was joined by Maldonado. The Mexican government had issued, consecutively, an entry permit for the motor home and an entry permit for a 1980 Oldsmobile station wagon driven by Maldonado. Maldonado, who had just purchased the station wagon in Texas, promptly shipped it to Puerto Rico; the motor home was returned to Massachusetts. Segarra later told Gassin that everything on the Mexico trip had gone according to plan.

It was after this last transfer of money that Los Macheteros issued their October 19, 1984 communiqué to the press, taking credit for the Wells Fargo robbery. Using the term "operative" in the sense of "oper-ation," the communiqué stated, in pertinent part, as follows:

This operative of economic recuperation contributed approximately seven million dollars to the revolutionary movement's funds.

The P.R.T.P.—MACHETEROS reports that all of the phases of said operative took a year and a half to complete. For that reason it has been decided to make it public at this time. We recognize the enemy's investigative capability, and that is why said operative needed a total guarantee of confidentiality with regard to those who carried it out. The P.R.T.P.—MACHETEROS publicly acknowledges the outstanding participation of comrade Victor Gerena.

We want to report that comrade Gerena is in a perfect state of health and has joined the struggle which our people carry out to obtain our liberation.

Today we are able to say that the economic resources obtained are in a state of maximum security according to our forces.

And that, in the same manner in which we have seized seven million dollars from the very bowels of American imperialism, the organized force of the Puerto Rican people will know how, in its own time, to seize the liberty which will allow us to choose our destiny as a people.

### 3. The January 1985 Gift Giveaway

In December 1984, the Macheteros organization decided to make what it termed its first use of the proceeds from the Wells Fargo robbery: gift giveaways in Hartford and in Puerto Rico, designed as a celebration of Three Kings' Day. In a recorded conversation, Segarra and Ramirez decided that $50,000 would be spent on a celebration that would include parties on January 6, 1985, and $40,000 worth of gifts. In late December, Ramirez and codefendant Carlos Ayes–Suarez flew from Puerto Rico to New York; they were followed by FBI agents to a toy store in Milford, Connecticut, where they spent more than $5,000 on toys. On January 6, Ramirez and two others, dressed as Wise Men, gave out toys on

a street in Hartford; Segarra participated in a similar celebration in Puerto Rico.

Two days later, a reporter in Puerto Rico received a call from a man who identified himself as a press contact for Los Macheteros. He told the reporter that the organization "had given away toys to poor children, both ... in Hartford and in Puerto Rico and that this was the first use that they had made of any of the money that had been stolen from West Hartford." The caller also stated that this was an activity of which Gerena approved. Segarra later told Gassin that he had been rebuked by other members of Los Macheteros for having told the press that the organization was responsible for the giveaway.

## C. *The Proceedings Below*

Segarra and Ramirez, along with 11 others, were arrested in August 1985; Maldonado and Camacho were arrested in March 1986. Appellants and 15 others were indicted in a 17–count superseding indictment. All four of the appellants were charged with obstruction of interstate commerce through robbery, and conspiracy to so obstruct, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 2 (counts 15 and 14, respectively); and with having conspired to commit bank robbery and transport the proceeds in interstate and foreign commerce, in violation of 18 U.S.C. §§ 371, 659, 2113, and 2314 (count 16). In addition, to the extent pertinent here, Camacho and Maldonado were charged with foreign transportation of stolen money, in violation of 18 U.S.C. §§ 2314 and 2, in connection with the September 1984 transfer of money to Mexico (count 13); and Ramirez and Carlos Ayes–Suarez were charged with interstate transportation of stolen money, in violation of 18 U.S.C. §§ 2314 and 2, in connection with the transfer of money from Puerto Rico to Connecticut in December 1984 for the January 6, 1985 Three Kings' Day celebration (count 17). Segarra was named in all 17 counts. To the extent pertinent here, in addition to counts 14, 15, and 16 as mentioned above, he was charged with aiding and abetting the robbery of the four federally insured banks in violation of 18 U.S.C. §§ 2113(a) and 2 (counts 1, 3, 5,

and 7); aiding and abetting the assaults on the Wells Fargo guard and supervisor during the robbery (counts 2, 4, 6, and 8); theft from interstate commerce in violation of 18 U.S.C. §§ 659 and 2 (count 9); interstate transportation of stolen money, in violation of 18 U.S.C. §§ 2314 and 2, in connection with the initial transfer of the Wells Fargo money from West Hartford to Springfield (count 10), and the later transfer of funds from Puerto Rico to Connecticut for the Three Kings' Day giveaway (count 17); and foreign transportation of stolen money, in violation of 18 U.S.C. §§ 2314 and 2, in connection with the transfers of money to Mexico in March 1984 (count 12), and September 1984 (count 13).

As discussed in Parts II and V below, defendants made a variety of pretrial motions seeking, *inter alia,* suppression of some 1,000 FBI surveillance tapes, suppression of certain postarrest statements, and change of venue. Except for the court's suppression of 378 of the surveillance tapes, these motions were denied.

The government's trial proof included the evidence described above. With the exception of Maldonado, who called a number of character witnesses, none of the defendants presented a defense. At the close of the government's case, the court dismissed the Hobbs Act counts (counts 14 and 15) against all of the appellants except Segarra.

The jury, after deliberating for nine days, returned verdicts convicting appellants of some charges and acquitting them of others. All four appellants were convicted on the bank robbery and transportation conspiracy count (count 16). Camacho was also convicted on the count 13 charge of foreign transportation of stolen money. Maldonado was acquitted on the count 13 charge, and Ramirez was acquitted on the count 17 interstate transportation charge. In addition to the count 16 conspiracy, Segarra was found guilty of aiding and abetting the robbery (counts 1, 3, 5, and 7); theft from interstate commerce (count 9); transporting stolen money in foreign and interstate commerce (counts 10, 12, and 13); obstructing interstate commerce through

robbery (count 15); and conspiring to obstruct commerce through robbery (count 14). Segarra was acquitted on five counts (counts 2, 4, 6, 8, and 17). Ayes–Suarez was acquitted of all charges.

Appellants were sentenced as indicated above, and these appeals followed.

### D. *Issues on Appeal*

On appeal, appellants make numerous claims of error. They contend principally (1) that all of the FBI surveillance tapes should have been suppressed on account of violations of their statutory and constitutional rights, (2) that the court made a number of errors in its evidentiary rulings, including admitting the Los Macheteros communiqué, and (3) that the trial court's instructions on the count 16 conspiracy charge erroneously (a) allowed the jury to convict them of a conspiracy other than that charged in the indictment and (b) failed to advise the jury to acquit if it found that the proof showed several conspiracies rather than the single conspiracy alleged in the indictment. Individual claims of error include Camacho's challenges to the admission of certain of his postarrest statements and of Gassin's identification of him; Maldonado's contentions that the court violated his Sixth Amendment right to counsel and that the evidence was insufficient to convict him; and Segarra's contentions that several of his cumulative punishments violate the Double Jeopardy Clause of the Fifth Amendment. We have considered all of defendants' contentions on these appeals and, with the exception of Segarra's double jeopardy challenge to his conviction and sentence under the Hobbs Act and § 659, have found them to be without merit.

## II. ELECTRONIC SURVEILLANCE ISSUES

In the spring of 1984, following a rocket attack on the federal building and United States Courthouse in Hato Rey, Puerto Rico, the government commenced electronic surveillance of Ojeda–Rios's home and automobile and of a nearby bank of public telephones. During this surveillance, agents came to believe that those involved in the rocket attack had also been involved in the September 1983 Wells Fargo robbery, and the government obtained court orders authorizing the interception of conversations concerning that matter. Thus, from April 1984 through August 1985, the FBI conducted surveillance directed toward the Wells Fargo robbery, and 1,011 original surveillance tapes were made.

Prior to trial, defendants moved to suppress the tapes, contending, *inter alia*, that their rights under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521 (1988) ("Title III"), and the Fifth and Sixth Amendments to the Constitution were violated by (a) the government's delays in having the original reel-to-reel surveillance tapes judicially sealed, and (b) the government's use and destruction of cassette work tapes. The district court, ruling that certain of the sealing delays violated Title III, granted the motion to suppress as to 378 tapes. *See United States v. Gerena*, 695 F.Supp. 649, 675, 682 (1988), *aff'd sub nom. United States v. Ojeda Rios*, 875 F.2d 17 (2d Cir.1989), *vacated and remanded sub nom., United States v. Rios*, —— U.S. ——, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990) (*"Rios"*). In other respects, the motion was denied. *See* 695 F.Supp. at 687. On appeal, appellants pursue their statutory and constitutional contentions with respect to the unsuppressed tapes. For the reasons below, we reject their appeal.

### A. *The Delays in Sealing*

During the 16–month–long electronic surveillance directed at the Wells Fargo robbery, the FBI recorded conversations at or near several locations in Puerto Rico, including (1) Ojeda–Rios's residence in Levittown (the "Levittown tapes"), (2) Ojeda–Rios's subsequent residence in nearby El Cortijo (the "El Cortijo tapes"), (3) Segarra's residence in Vega Baja (the "Vega Baja tapes"), and (4) a "safe house" at the El Centro Condominium in Hato Rey (the "El Centro tapes"). Authorization for the El Cortijo interceptions expired on Septem-

ber 24, 1984; those tapes were judicially sealed on October 13, 1984. To the extent pertinent here, authorization for the Vega Baja interceptions expired on May 30, 1985; those tapes were judicially sealed on June 15, 1985. The El Centro interceptions ended on August 30, 1985; those tapes were judicially sealed on September 14, 1985.

Defendants moved prior to trial to suppress all of the surveillance tapes on the ground, *inter alia,* that the government had violated the requirement in Title III that surveillance tapes be submitted to the court for sealing "[i]mmediately." *See* 18 U.S.C. § 2518(8)(a). Following evidentiary hearings that extended from September 1987 to June 1988, the court granted the motion in part and denied it in part. Though the court ruled that 378 tapes, largely focusing on Levittown, should be suppressed because of inexcusable sealing delays ranging from 82 to 118 days, it ruled that the sealing delays of 15–19 days with respect to the El Centro, Vega Baja, and El Cortijo tapes had been satisfactorily explained by the government. Concluding also that the government's procedures had been "sufficient to preserve the accuracy of recordings and deter alteration of those recordings pending a judicial order sealing the tapes," 695 F.Supp. at 664, the court ruled that the remaining 633 tapes should not be suppressed. On appeal, appellants contend that the government failed to establish the integrity of the tapes and that the district court erred in determining that the government's explanations for these delays in sealing were satisfactory. We reject these contentions.

Title III establishes the procedures to be followed by the government in connection with electronic surveillance in the course of an investigation. In addition to setting out the procedures to be followed by agents when applying for an electronic surveillance order, by judicial officers when issuing such orders, and by monitoring agents when acting on such orders, § 2518 provides for the "[i]mmediate[ ]" judicial sealing of authorized recordings when the authorized surveillance period is over:

Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom....

18 U.S.C. § 2518(8)(a). We have stated that sealing "within one or two days" will normally be deemed immediate, but that "any delay beyond that certainly calls for explanation." *United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). Thus, we have held that sealing was not immediate within the meaning of § 2518(8)(a) where there were delays of 15 days, *see United States v. Massino,* 784 F.2d 153, 157 (2d Cir.1986), or 14 days, *see United States v. Rodriguez,* 786 F.2d 472, 476 (2d Cir.1986), or 13 days, *see United States v. Poeta,* 455 F.2d 117, 122 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), or even less, *see, e.g., United States v. McGrath,* 622 F.2d 36, 42–43 (2d Cir.1980) (three-to-eight days).

■ If surveillance tapes have not been sealed immediately, they must be suppressed unless the government furnishes an explanation for the delay that is "satisfactory" within the meaning of the statute. *See Rios,* 110 S.Ct. at 1850; *United States v. Rodriguez,* 786 F.2d at 477. In *Rios,* the Supreme Court rejected an argument by the government that the "satisfactory explanation" requirement will be satisfied if the government simply states the reason for the delay and shows that the tapes are authentic. The Court stated that "the 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable." 110 S.Ct. at 1850.

■ In reviewing the proffered reasons for the delay and the questions of historical fact, such as "the date on which authorization for the wiretap expired, the date on

which presentation was made for judicial sealing, [and] the methods used by [law enforcement] agents to secure the tapes," we will not disturb the district court's findings unless they are clearly erroneous. *United States v. Rodriguez*, 786 F.2d at 476; *see also United States v. Koskerides*, 877 F.2d 1129, 1131 (2d Cir.1989) (clearly erroneous test applies to finding on government agency's adherence to internal procedures). The matter of whether the government's reasons are satisfactory, however, is a question of law subject to plenary review. *See United States v. Rodriguez*, 786 F.2d at 476.

In general, explanations have been ruled satisfactory where the government advanced a bona fide reason, there was no reason to believe there was any deliberate flouting of the Title III requirements, no reason to doubt the tapes' integrity, and no basis for inferring any other prejudice to the defendants. Thus, in *United States v. Rodriguez*, we observed that

[i]n most cases when (1) the government has advanced reasons for the delay, such as the need to perform administrative tasks relating to the tapes prior to sealing, (2) there is no basis for inferring that the government sought by means of the delay to gain a tactical advantage over the defendant or that it had any other improper motive, and (3) there has been no showing that there has been tampering with the tapes or that the defendant has suffered any other prejudice as a result of the delay, the government's explanation has been accepted as satisfactory.

786 F.2d at 477; *see id.* at 477–78 (listing cases and explanations deemed satisfactory); *United States v. Massino*, 784 F.2d at 157 (same). Bona fide administrative obstacles may provide an acceptable excuse. *See, e.g., id.* at 158 (where possibility of leak that threatened large-scale organized crime investigation could not be foreseen, insufficient resources to handle leak and prepare tapes for sealing was satisfactory explanation for 15–day delay); *United States v. McGrath*, 622 F.2d at 42–43 (explanation that tapes had to be moved from Binghamton to Albany to Auburn, New York, deemed satisfactory excuse for "relatively short" delays of three-to-eight days that included a weekend); *United States v. Vazquez*, 605 F.2d at 1279–80 (explanation that there were equipment breakdowns, a shortage of Spanish-speaking agents to translate conversations, and a large number of tapes needing duplication, labeling, and checking was deemed satisfactory excuse for 7– to 13–day delay where there was no evidence of bad faith or lack of diligence); *United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir.1977) (explanation that prosecutor was preoccupied with imminent trial deemed satisfactory for seven-day delay where there was no indication of bad faith or attempt to evade statutory requirements), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 & 401 (1978).

In addition, delays based on the government's erroneous understanding of Title III's requirements may be excusable if the law has not been settled and the misunderstanding is not otherwise unreasonable. In *Rios*, which concerned the satisfactoriness of the government's explanation for the delays in sealing certain Levittown and Vega Baja public telephone tapes in the present prosecution, the excuse advanced by the government was that the supervising attorney believed he did not have to seek a judicial sealing of the tapes until "there was a meaningful hiatus in the investigation as a whole," *i.e.*, until not only the original order but also all extensions of that order had expired. 110 S.Ct. at 1851. The Supreme Court noted that

[i]n establishing a reasonable excuse for a sealing delay, the Government is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was objectively reasonable at the time.

*Id.* Noting that the government's interpretation was not unreasonable in light of the then-state of the law of this Circuit, (which we note remains undefined, *see, e.g., United States v. Badalamenti*, 794 F.2d 821, 825 (2d Cir.1986); *United States v. Vazquez*, 605 F.2d at 1278 n. 21; *see also United States v. Mora*, 821 F.2d 860, 863 n. 4 (1st Cir.1987)), the *Rios* Court remanded

for a determination of whether the excuse proffered by the government in the Supreme Court was the explanation that had been offered at the suppression hearing. In *United States v. Rodriguez*, we similarly ruled that an explanation based on a mistaken view of the law could nonetheless be satisfactory within the meaning of Title III if the mistaken belief was genuine. 786 F.2d at 478.

In the present case, the delays in sealing the tapes were 19 days for the El Cortijo tapes, 16 days for the Vega Baja tapes, and 15 days for the El Centro tapes. Though the government's reasons for these delays were based on misunderstandings that should not be allowed to recur, we are persuaded that the district court did not err in concluding that as to these 633 tapes, the explanations were "satisfactory" within the meaning of Title III and that the integrity of the tapes was sufficiently established to warrant denial of the motion to suppress.

■ In seeking to explain the El Cortijo 19–day delay, the government offered the testimony of Department of Justice ("DOJ") attorney Frank Bove, who supervised most of the Title III compliance in this case. Bove testified that the delay resulted from his belief that the requirement for immediate sealing "upon the expiration of the period of the order, or extensions thereof," 18 U.S.C. § 2518(8)(a), meant that if the interceptions at various locations were interrelated, the statute required sealing only when there existed a hiatus in the electronic surveillance orders considered as a group. Bove testified that he had read the Title III statute prior to commencing the investigation, that he had had access to treatises on Title III, and that he had spoken with other DOJ attorneys, none of whom had indicated that this interpretation of Title III was in error. Since the last surveillance order for Ojeda–Rios's automobile expired on October 10, 1984, Bove believed the government was allowed until that date to present for sealing all of the tapes with respect to both that vehicle and Ojeda–Rios's home.

Though this was an incorrect understanding of the law, the district court found that Bove had acted in good faith with respect to his understanding of the deadline and that there was no indication that the unwarranted delay was deliberate. This finding was based on the facts, *inter alia*, that Bove alerted the court one week before what he presumed was the deadline; he coordinated the sealing process with other government employees so that the tapes could be presented to the court on the day after the expiration of the order for the car; and the sealing of the El Cortijo tapes was in fact completed on the third day after the expiration of that order.

■ The explanation offered by the government for the 16–day delay in presenting the Vega Baja tapes was somewhat different. One day prior to the May 30 expiration of the last Vega Baja authorization, Bove sent a memo to FBI Supervisory Special Agent George Clow, informing Clow of the approaching expiration date and asking him to "[a]dvise [Bove] as soon as the tapes are ready for sealing so that we can coordinate with the Judge's schedule." When Bove received no immediate response from Clow, he assumed it was because the FBI agents could not spare the time from their preparation of affidavits in support of the imminent applications for search warrants. When he had heard nothing for a week, he contacted liaison agent Marlene Hunter and got the process moving. In fact, however, the reason for the delay was not that the agents were too busy but that there was a misunderstanding on the part of the pertinent FBI agents. Hunter had just been placed in charge of coordinating the sealing process for the Vega Baja tapes and had never before served as liaison between the FBI and the prosecutor's office. She testified that she had been told by the departing liaison that she was to wait for a call from the prosecutor's office before beginning the sealing process. Hunter testified that while she was aware of the sealing requirement, she was not aware of the need for expedition in completing the task, and she thus waited for a call from the attorneys.

■ A third explanation was offered for the 15–day delay in connection with the El Centro tapes. The final authorization for surveillance at the El Centro "safe house" expired on September 22, 1985. The agents actually ended surveillance of that location, however, with no intent to resume, on August 30, 1985, because on that date a search warrant was executed there. By this time Bove had departed from Puerto Rico, and the person responsible for presenting these tapes to the sealing judge was Assistant United States Attorney ("AUSA") Roberto Moreno. Moreno testified that it had been his belief that the sealing requirement was triggered by the end of the 30–day extension order and not by the earlier cessation of surveillance. Based on this understanding, Agent Moreno simply did not rush to have the tapes sealed immediately after the surveillance ceased on August 30; he did, however, manage to present them for sealing well in advance of what he thought the deadline was.

The district court found that each of these explanations, though founded on interpretations of the law that were erroneous, was credible. If found that there was no bad faith on the part of the agents or the supervising attorneys and that all government personnel involved had acted expeditiously within the framework of their understandings of what was required. It is within the province of the district court to make determinations as to credibility, and we conclude that its findings as to the reasons for the delay and the lack of bad faith are not clearly erroneous.

■ Nor do we find any error in the court's determination that the government established the tapes' integrity. The record revealed that the monitoring agents faithfully followed the FBI's written guidelines for safeguarding the integrity of the tapes. At the start of each shift, the monitoring agents filled out special chain-of-custody envelopes, showing, *inter alia*, their names, the date, and the time. On the leader of each tape, the agents noted the location involved, the date, time, and reel number, and their initials. At the conclu-

sion of a monitoring shift, the agents placed the completed tapes in the custody envelopes and normally took them immediately to FBI headquarters in Hato Rey. On occasion, because of the lateness of the hour and the distance of the monitoring site, agents left the completed tapes in the custody of the FBI security agent on the premises, and the latter agent turned the tapes in the following morning.

Upon delivery to FBI headquarters, the tapes were deposited in a locked, restricted-access room. An electronic surveillance clerk ("the Clerk"), assigned to maintain custody of the tapes and to control access to the evidence room, had the only set of keys to that room except for one set kept in a safe in the supervising agent's office. Before sealing a chain-of-custody envelope, the Clerk verified that the tape was properly labeled and required any discrepancy between the information on the envelope and the information on the tape leader to be resolved by the responsible agent.

Once the information on the tape had been checked, the Clerk sealed the envelope and placed it in a bar-locked filing cabinet. Only the Clerk had a key to the cabinet. If an agent wished to remove a tape from the evidence room, the Clerk required him to produce authorization from the supervisor. Any release of a tape was noted on its chain-of-custody envelope, along with the signature of the person accepting custody of the tape. Any opening of a sealed chain-of-custody envelope was also noted on the envelope. The Clerk never released a tape that had been judicially sealed.

The government also presented expert testimony that the sealed tapes were originals, not copies, and that they had not been edited or tampered with. Though defendants' expert witness offered his opinion to the contrary, the decision as to which view to credit was the province of the district court and we find in the record no basis for disturbing its decision to credit the government's expert.

In sum, we see in the record no basis for overturning the district court's finding that the integrity of the tapes had been assured, its rulings that the government's explana-

tions for the 15– to 19–day intervals were satisfactory, or its conclusion that these delays did not warrant suppression of the tapes.

### B. *The Use and Destruction of Work Cassettes*

The FBI agents monitoring the surveillance in Puerto Rico were instructed to make one set of original and one set of duplicate original reel-to-reel tapes, and to deliver both sets to FBI headquarters in Hato Rey. They were instructed not to replay either the originals or the duplicates in the course of interception. As a result, in order to assist them in making accurate written log summaries of the intercepted conversations, the agents used cassette recorders, plugged into the reel-to-reel recorders, to make cassette copies of the recordings. Some of these cassette work tapes, particularly those that discussed the travel plans of Segarra, were sent to supervisory agents for expedited review. Most of the other cassette work tapes were reused after the logs were prepared; reuse erased existing material on the tapes. In addition, at the conclusion of each surveillance, many of the work tapes were sent through a bulk eraser in order to maintain confidentiality. The use of these cassette work tapes was revealed during the court hearings on the sealing of the reel-to-reel tapes. It was also revealed that 39 cassette tapes remained unerased. A comparison of these 39 work tapes against the corresponding reel-to-reel tapes revealed that four work tapes in fact contained a total of 11 minutes of unauthorized material, *i.e.*, material that was neither on the reel-to-reel tapes nor permissibly recorded while the reel-to-reel tapes were being changed. Defendants contended that their rights under Title III and the Fifth and Sixth Amendments were violated by these procedures because, *inter alia*, (1) the agents' use of the cassette work tapes was unauthorized, and (2) the erasures of the work cassettes denied them due process and violated their discovery rights, prejudicing their ability to litigate the Title III issues.

The district court conducted an extensive hearing. Sixty-five Spanish-speaking FBI agents from various parts of the United States had been assigned to Puerto Rico temporarily to act as Title III monitoring agents; each of the 65 submitted to the court two affidavits addressing (a) the general procedures and (b) the creation of the work cassettes. In addition, 25 of the agents, as a representative sample chosen by defendants, testified. The agents stated in their affidavits that, to the best of their knowledge, at no time had they recorded anything on a work cassette tape that was not also on an original and a duplicate original reel-to-reel tape. Monitoring agents explained that the unauthorized material found on the work tapes resulted from periodic sound checks during which the agents adjusted the tape/input switch on the reel-to-reel recorders but failed to make a corresponding adjustment to the cassette recorder, causing the latter to record independently of the reel-to-reel recorder.

After the hearing, the court denied the motion to suppress on this ground. In a published opinion, *United States v. Gerena*, 695 F.Supp. 1369 (1988), the district court found that the use of work cassettes was necessary and justified. As to the unauthorized 11 minutes of intercepted material on the work cassettes, the court credited the testimony of the agents and found that "no monitor deliberately created a situation where the cassette recorder was operating independently of the reel-to-reel recorders in order to record more information on a work cassette than was on the reel-to-reels." *Id.* at 1376. Since the agents had no knowledge of the "extra" information on the tapes, their subsequent reuse and erasure of the tapes was not a deliberate destruction of evidence. Accordingly, though the court found that the government should have preserved all such cassettes and should have disclosed this facet of the operation earlier in the discovery stages of the prosecution, it concluded that defendants were not prejudiced by the government's lapses. *Id.* at 1377.

Defendants contend that the district court's refusal to suppress the reel-to-reel

tapes should be reversed because the government's use and destruction of the cassette work tapes violated Title III and their rights to due process and the effective assistance of counsel. We disagree.

### 1. Suppression Under Title III

■ Insofar as is pertinent to the issue of the work tapes, Title III provides as follows:

The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording ... shall be done in such way as will protect the recording from editing or other alterations.... [S]uch recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations.

18 U.S.C. § 2518(8)(a). Subsections (1) and (2) of § 2517 allow law enforcement officials who have permissibly gained knowledge of the contents of authorized interceptions to use those contents and disclose them to another officer to the extent necessary for the performance of official duties. *See* 18 U.S.C. § 2517(1) and (2). The contents of a communication that was "unlawfully intercepted" are to be suppressed. 18 U.S.C. § 2518(10)(a); *see generally United States v. Giordano*, 416 U.S. 505, 524–29, 94 S.Ct. 1820, 1831–33, 40 L.Ed.2d 341 (1974).

■ We doubt, given the structure of § 2518(8)(a), that that section was intended to prohibit the erasure of work tapes that are merely duplicates. Though the section provides for the preservation and sealing of the recordings of intercepted communications, all of those requirements are specified before there is any mention of duplicate tapes. The section gives no indication

that Congress intended that duplicate tapes be subject to the same requirements as original tapes. For example, it would seem that duplicate tapes need not be judicially sealed, for the section envisions their use by law enforcement officials but makes no provision for their *un*sealing. Nor is there any indication in the legislative history that Congress intended that duplicate tapes be subject to the same requirements as original tapes.

The fact that the work tapes contained material that was not on the reel-to-reel tapes means that there was some failure to follow the procedures established by Title III and that some of the work cassettes were not merely duplicates. The district court found that the discrepancy was *de minimis* since of the 39 surviving work cassettes, only four had excess material, and that the unauthorized material totaled only 11 minutes. These findings must be upheld unless they are clearly erroneous. *See, e.g., United States v. Koskerides*, 877 F.2d at 1131; *United States v. Chiarizio*, 525 F.2d 289, 292–93 (2d Cir.1975). In light of the record, the court's findings that the capture of this excess material was inadvertent, and that the destruction of the excess material was unknowing, and hence not deliberate, are not clearly erroneous. We conclude that the court's rulings that defendants were not prejudiced by either this accidental over-recording or the inadvertent erasure of the material, and that Title III did not require suppression of the reel-to-reel tapes were not an abuse of discretion.

### 2. Suppression Under Other Provisions

We find no greater merit in appellants' contentions that the reel-to-reel tapes should have been suppressed on due process or other constitutional grounds or for interference with their discovery rights, *see* Fed.R.Crim.P. 16 and the Jencks Act, 18 U.S.C. § 3500 (1988). Though those provisions impose on the government duties independent of Title III to preserve discovery materials, we do not think they required suppression of the reel-to-reel recordings in the present case. We have generally de-

clined to conclude that suppression was warranted where the interception operation itself was lawful and the district court found that there was no sufficient indication that the government's destruction of recordings was in bad faith and found that the destruction did not prejudice the defendant. *See, e.g., United States v. Grammatikos,* 633 F.2d 1013, 1021 (2d Cir.1980); *United States v. Bufalino,* 576 F.2d 446, 449–50 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); *United States v. Miranda,* 526 F.2d 1319, 1326 (2d Cir.1975) (court must " 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost and the evidence of guilt adduced at the trial' ") (quoting *United States v. Bryant,* 439 F.2d 642, 651 (D.C.Cir.1971)), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *see also Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"); *United States v. Huss,* 482 F.2d 38, 51 (2d Cir.1973) (where there had been unlawful taping and willful destruction of the tapes, contempt order was reversed).

We find no abuse of discretion in the district court's conclusion that, given the apparently minimal extent to which the work cassettes contained material that was not on the reel-to-reel tapes and the inadvertence of the interception and destruction of that excess material, suppression of the reel-to-reel tapes would have been inappropriate.

## III. EVIDENTIARY RULINGS

Appellants raise a number of challenges to the trial court's evidentiary rulings. Their principal contentions are that the court (a) improperly restricted their cross-examination of FBI agents on the issue of the work cassettes, and (b) erred in admitting in evidence the Los Macheteros October 1984 communiqué claiming credit for the Wells Fargo robbery. They also contend that admission of the communiqué

violated their Sixth Amendment rights of confrontation. We reject all of these contentions.

### A. *Restrictions on the Scope of Cross-Examination*

Defendants contend that the district court improperly "preclude[d] any and all cross-examination into the irregularities of the electronic surveillance operation—including the credibility of the testifying agents," particularly on the subject of the work cassettes. (Segarra–Ramirez–Camacho brief on appeal at 136.) They contend that this *"wholesale preclusion"* (*id.* at 137 (emphasis in original)) violated their Sixth Amendment rights of confrontation. We reject this contention because it does not accurately reflect the record and because the court's actual rulings were within the bounds of discretion.

The Confrontation Clause of the Sixth Amendment guarantees the defendant in a criminal prosecution the right to confront the witnesses against him. This "means more than being allowed to confront the witness physically," for " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.'* " *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974) (quoting 5 *Wigmore on Evidence* § 1395, at 123 (3d ed. 1940) (emphasis in original)); *see Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986). The court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. at 677, 679, 106 S.Ct. at 1435; *see also United States v. Pedroza,* 750 F.2d 187, 195–96 (2d Cir. 1984).

The Confrontation Clause does not deprive the trial judge of all discretion in setting limits on the cross-examination. The Federal Rules of Evidence instruct the trial court to supervise the "mode ... of interrogating witnesses" so as to make the presentation effective for "the ascertainment of the truth" and to "avoid needless

consumption of time." Fed.R.Evid. 611. Rule 403 permits the court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of ... [*inter alia*] confusion of the issues, or misleading the jury...." Fed.R. Evid. 403. Thus, the trial judge has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, ... interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *see United States v. Rahme*, 813 F.2d 31, 37 (2d Cir.1987) (scope and extent of cross-examination are within sound discretion of trial court); *United States v. Pedroza*, 750 F.2d at 195 (same). The decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused. *United States v. Tillem*, 906 F.2d 814, 827 (2d Cir.1990); *see United States v. Tutino*, 883 F.2d 1125, 1140 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

■ We find no deviation from these principles or abuse of discretion in the present case. While it is true that early in the trial the court ruled that "[c]ounsel shall not refer to the cassettes again in his cross-examination," (November 3, 1988 trial transcript ("Tr.") at 124), the court did not adhere to this ruling. Thus, it did permit cross-examination on a wide variety of topics surrounding the FBI's electronic surveillance, including the use and reuse of work cassettes. For example, on cross-examination by counsel for Segarra, one agent testified as follows:

Q. ... [Y]esterday you affirmed that it was your opinion that if FBI agents made cassette recordings intentionally and put information on a cassette tape that was not put on the official reel-to-reel, that that would be a violation of the law?

A. That is correct, Mr. Weinglass.

Q. And yet it's a fact, is it not, Agent Balizan, that you and your partner, Agent Aponte, made at least one cassette recording with information that isn't contained on a reel-to-reel?

A. That is correct.

Q. And the fact that you did that came to light after you had assured this Court, when you first testified, that all the information that you recorded on the reel-to-reel, on the cassette, sorry, could be found on the reels?

A. Is that the question?

Q. Yes.

A. That is correct, Mr. Weinglass.

Q. And it turned out you were wrong?

A. That is correct.

Q. And you really don't know today how many times you did that?

A. That is the only instance that I know of, that 439A tape.

Q. Well, that was the only time you were found out because we had the cassette, but you—

MR. DANAHER [AUSA]: Objection. This is argumentative. It's been covered yesterday.

MR. WEINGLASS: I'll withdraw that.

Q. (By MR. WEINGLASS) Isn't it a fact that you destroyed all the other cassettes so we can't find out?

A. I don't know how many of my work cassettes came into Court, Mr. Weinglass.

(November 30, 1988 Tr. at 12–13.) This subject was explored repeatedly during the trial in the cross-examinations of several agents. Given this record, we conclude that the trial court did not abuse its discretion with respect to the scope of cross-examination.

B. *The Admission of the Communiqué*

At trial, defendants sought to forestall the government's introduction of the Los Macheteros October 1984 communiqué quoted in Part I.B.2. above, which claimed credit for the Wells Fargo robbery. Defendants contended principally (a) that the communiqué was not properly authenticated pursuant to Fed.R.Evid. 901, and (b) that it was inadmissible hearsay because it was not shown to be a statement by a coconspirator "in furtherance of" the al-

leged conspiracy, *see* Fed.R.Evid. 801(d)(2)(E). The district court denied defendants' motion. It ruled that the communiqué was adequately authenticated, noting that the document bears the Los Macheteros logo, that it was found at the home of one of the coconspirators, and that it contained information that only a conspirator would know. The court concluded that all of the circumstances suggested that the document "is what the proponent claims it is—a statement by a co-conspirator." *Ruling on Admissibility of Search Documents* dated March 6, 1989, at 14. The court ruled that the communiqué was in furtherance of the conspiracy, noting that "[t]he document informs readers of the status of the conspiracy—Victor Gerena is 'in a perfect state of health', having 'joined the struggle' for liberation, and the 'economic resources obtained are in a state of maximum security.'" *Id.* at 15. We find no basis for overturning these rulings.

### 1. Authentication as a Coconspirator Document

██ In general, a document may not be admitted into evidence unless it is shown to be genuine. *See, e.g.,* 7 *Wigmore on Evidence* §§ 2129, 2130 (3d ed. 1940). The requirement that the document be authenticated may be satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901. This evidence may be direct or circumstantial, *see United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), and the latter category may include distinctive characteristics of the document itself, such as its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," Fed.R.Evid. 901(b)(4).

██ With respect to a document attributed to the defendant, the prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to him. *United States v. Natale,* 526 F.2d at 1173; *see United States v. Mendel,* 746 F.2d 155, 167 (2d Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). In accordance with Rule 901(b)(4), "the contents of a writing may be used to aid in determining the identity of the declarant," *United States v. Wilson,* 532 F.2d 641, 644 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), if, for example, the writing "deal[s] with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding so that the contents of the [writing] were not a matter of common knowledge," 5 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 901(b)(4)[01], at 901–49 (1990).

██ Preliminary questions as to the admissibility of evidence are to be determined by the trial court; in making its determination, the court may consider evidence, other than that subject to a privilege, that would not necessarily be admissible at trial. Fed.R.Evid. 104(a). The trial court's ruling that a particular item of evidence has been properly authenticated will not be overturned on appeal absent an abuse of discretion. *United States v. Mendel,* 746 F.2d at 167.

██ There was no abuse of discretion here in the ruling that the communiqué was sufficiently shown to be a document written by one or more of the coconspirators. The communiqueé's appearance, contents, substance, timing, and provenance, together with other evidence, all suggested that it was such a document. First, there was strong evidence that the communiqué was in fact a Los Macheteros document. It bore a Los Macheteros logo that was indistinguishable from the Los Macheteros logo that appeared on other documents whose authenticity was not challenged. It claimed responsibility for the Wells Fargo robbery, which was consistent with Segarra's telling Cox that the robbery had been a Los Macheteros operation. And the proposition that the communiqué was a Los Macheteros document was consistent with other evidence that Los Macheteros frequently sought publicity for their acts. For example, Segarra himself had called the press about the Three Kings' Day celebrations. The resulting news report mentioned that

Los Macheteros had publicly claimed credit for 10 other acts of violence in Puerto Rico; though this report was not admitted into evidence at trial, it was nonetheless a source that the trial court was entitled to consider in determining the question of the likelihood that members of Los Macheteros had authored the October 1984 communiqué. In addition, a Los Macheteros document entitled "Report of the Central Committee to the Congress," a copy of which was found in the same place as the Wells Fargo communiqué noted that "[t]he news agencies are attentive to our communiqués...."

Though the precise identity of the author of the October 1984 communiqué was unknown, there was also a sound basis for inferring that it had been authored by one or more of the coconspirators, for it contained information unlikely to be known by others. For example, this document stated that it was now safe to claim responsibility for the robbery; and indeed, the last large portion of the robbery proceeds had been secretively transported to Mexico less than a month before. The communiqué also revealed that the whole operation had taken 18 months to plan and execute; and indeed, telephone toll records showed that Segarra had been in contact with Gerena in March 1983, precisely 18 months before the final September 1984 money move. Though the September 12, 1983 date of the robbery was public knowledge, only coconspirators were likely to have known that the planning phase of the robbery had taken six months. The inference that the communiqué was a coconspirator document was further supported by the fact that a copy was found at the home of a codefendant, Avelino Gonzalez–Claudio (author of the April 1984 letter mentioned in Part I.B.1. above, which described the planning and execution of the March 1984 money move), along with several other coconspirator documents, including Segarra's July 1984 notes describing the planning of the robbery, and a document entitled "Political–Ideological Document Regarding the Organization's Problem," which noted that conflicts within the organization had come to a

head as a result of "Aguila Blanca," the code name for the Wells Fargo operation.

Defendants' challenges to the authenticity of the communiqué, such as their argument that the "logo could have been constructed by someone outside the Macheteros organization" (Segarra–Ramirez–Camacho brief on appeal at 61), go more to the weight of the evidence than to its admissibility. The district court did not err in ruling that the document's contents and the surrounding circumstances provided a rational basis for concluding that the document was what the government claimed it was, *i.e.*, the statement of a coconspirator.

### 2. In Furtherance of the Conspiracy

Nor did the court err in finding that the communiqué was a statement in furtherance of the conspiracy and hence admissible as nonhearsay under Rule 801(d)(2)(E). In order to admit a statement under this Rule, the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). To be in furtherance of the conspiracy, a statement must be more than a "mere[ ] narrative" description by one coconspirator of the acts of another. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Lieberman*, 637 F.2d 95, 102–03 (2d Cir.1980); *see also United States v. Paone*, 782 F.2d 386, 390 (2d Cir.) (mere "idle chatter" does not satisfy Rule 801(d)(2)(E)), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). Rather, the statements must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d at 1199. In addition to the more obvious types of communications to implement a conspiratorial operation, statements between coconspirators that may be found to

be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy. *United States v. Rahme*, 813 F.2d at 35–36; *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

■■■■ Preliminary questions as to whether a proffered statement meets the requirements of Rule 801(d)(2)(E) are to be determined by the trial court by a preponderance of the evidence. *See, e.g., Bourjaily v. United States*, 483 U.S. at 181, 107 S.Ct. at 2781–82; *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d at 1198; *United States v. DeJesus*, 806 F.2d 31, 34–35 (2d Cir.1986), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987); *see generally* Fed.R.Evid. 104(a). The finding that a given statement was uttered by a coconspirator "in furtherance" of a conspiracy will not be disturbed on appeal unless it is clearly erroneous. *United States v. Rahme*, 813 F.2d at 36. Where there are two permissible views of the evidence, the court's choice between them cannot be deemed clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

While we regard the question of whether the document was "in furtherance of" the conspiracy as closer than the question of whether it was authored by a coconspirator, we find no clear error in the district court's conclusion that the communiqué satisfied the "in furtherance" element of Rule 801(d)(2)(E). Though defendants argue that the communiqué could not have been in furtherance of the conspiracy because it stated that "all of the phases of said operative took a year and a half to complete," thereby indicating that the conspiracy had ended, and this was perhaps an arguable view, it was also permissible to draw the contrary inference. The tone of the communiqué reflected an ongoing operation contemplating the use of the robbery proceeds. The document stated that the September 1983 robbery had made a $7 million contribution to the organization's funds, and the money was "in a state of maximum security." The government's evidence, including conversations intercepted through August 1985 and documents seized from the homes of various codefendants on August 30, 1985, likewise showed a continuing conspiracy that encompassed not just the robbery of the Wells Fargo depot and transportation of the money from the mainland United States, but also plans for the use of the robbery proceeds. See Part IV.B. below.

The communiqué also stated that Gerena, whose contribution to the operation was described as "outstanding," was in good health and had joined the revolutionary struggle. Though Gerena had been publicly suspected of perpetrating the robbery, it had not previously been revealed that he was affiliated with Los Macheteros. Thus, the communiqué provided coconspirators with reassurance as to the organization's status and solvency, new information as to the membership of the conspiracy, and encouragement for future organizational activities. Finally, since the "Report of the Central Committee to the Congress" suggested that the organization's prestige was enhanced through the use of press communiqués, this communiqué could properly be viewed as an effort to gain public approbation for the conspirators' prior actions and their future use of the robbery proceeds.

In all the circumstances, we conclude that the trial court's finding that the communiqué was in furtherance of the conspiracy was not clearly erroneous.

■■■■ Finally, we reject defendants' argument that admission of the communiqué deprived them of their Sixth Amendment rights of confrontation. Where, as here, the Rule 801(d)(2)(E) preconditions are met, "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of [the] statements." *Bourjaily v. United States*, 483 U.S. at 183–84, 107 S.Ct. at 2783.

## IV. THE INSTRUCTIONS ON THE COUNT 16 CONSPIRACY CHARGE

Count 16 of the indictment charged the defendants with conspiring, in violation of 18 U.S.C. § 371, to commit offenses against the United States, to wit, the taking from banks, by force, violence, and intimidation, of money that was part of an interstate shipment of property, in violation of 18 U.S.C. §§ 659 and 2113, and the transportation of the stolen money in interstate and foreign commerce, in violation of 18 U.S.C. § 2314. Appellants contend that the trial court's charge to the jury with respect to count 16 was flawed principally because it (1) permitted the jury to convict on the basis of proof of any conspiracy, not solely the conspiracy alleged in count 16, or even to convict merely on the basis of membership in Los Macheteros, and (2) failed to instruct the jury that it should acquit if it found several conspiracies rather than the single conspiracy alleged in the indictment. We are unpersuaded.

### A. The Focus on the Alleged Conspiracy

■■■ It is fundamental that in order to find a given defendant guilty of conspiracy, the jury must find that he was a member of the conspiracy that was charged in the indictment; membership only in some other conspiracy will not suffice. *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Tramunti*, 513 F.2d 1087, 1107 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Further, the government must prove that each defendant charged with conspiracy has entered an agreement to violate the law; mere membership in a lawful organization cannot suffice. *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir.1989); *United States v. Rios*, 856 F.2d 493, 496 (2d Cir.1988). It is also established that, in reviewing claims of error in the trial court's jury charge, we must consider the challenged portions not in isolation but in light of the instructions as a whole. *See, e.g., Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Gaggi*, 811 F.2d 47, 61–62 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

■■■ In their brief on appeal, appellants state that the court "explicitly" and "repeatedly invited the jury to convict upon a finding of any conspiracy whatsoever," and "not necessarily the one alleged in count sixteen." (Segarra–Ramirez–Camacho brief on appeal at 1, 31.) They have not, however, pointed us to any such invitation in the record. Rather, appellants quote portions of the instructions that referred to "a" conspiracy, and they rest their argument entirely on the court's use of that indefinite article:

> "The first element is the requirement that the Government prove beyond a reasonable doubt that two or more persons conspired to commit an offense. In short, *that a conspiracy existed.* A conspiracy is a combination of two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means.... In determining *whether a conspiracy existed,* you should consider the actions and declarations of all the alleged participants." ...

Later, the district court reiterated that some conspiracy needed to be found, again without reference to the need to find the single conspiracy specified in count sixteen: "In other words, if you find that *there was a conspiracy* and if you find that a particular Defendant was a member of that conspiracy, then you may consider [his co-conspirators' declarations]."

(Segarra–Ramirez–Camacho brief on appeal at 30, quoting jury charge, March 28, 1989 Tr. at 154–55, 160 (emphasis in brief).) Such use of the indefinite article is common, however, in the course of educating a jury as to general principles of law, and indeed, we note that the charge proposed by defendants themselves referred on occasion to "a" conspiracy or "an" existing conspiracy. The quoted excerpts of the charge actually given by the court cannot properly be assessed in isolation; they

must be considered in the context of the charge as a whole, and when so considered, the charge was appropriate. Prior to the statements emphasized by appellants, the court's charge had in fact focused the jury's attention precisely on the conspiracy charged in the indictment. The court had begun by stating that in count 16, "[a]ll five Defendants are charged with conspiracy to violate federal law," and by tracking the language of that count:

Paragraph 3 states that between on or about March 19, 1983 and August 30, 1985, the Defendants, except Paul Weinberg, were members of a group that called itself the Macheteros and funded its operations and activities, in part, through economic expropriations, including robbery.

Paragraph 4 alleges that said Defendants did willfully, unlawfully and intentionally combine, conspire, confederate and agree together and with each other, as well as others, to commit offenses against the United States; that is: Paragraph one, "To unlawfully take by force, violence and intimidation, from the person and presence of another, money belonging to and in the care, custody, control, management and possession of a bank insured by the Federal Deposit Insurance Corporation, in violation of Title 18, U.S.Code Section 2113(a).

"Two, to embezzle, steal, unlawfully take and unlawfully carry away goods, that is money, moving as and which were part of and which constituted an interstate shipment of freight and property in violation of Title 18 U.S.Code, Section 659."

And three, "To transport in interstate and foreign commerce money of the value of $5,000 or more, knowing that the money had been stolen in violation of Title 18, U.S.Code, Section 2314."

It was part of the conspiracy that the Defendants would and did devise and approve a plan whereby Victor Gerena also known as "Aguila," an employee guard for the Wells Fargo Armored Service Corporation, would rob Wells Fargo in West Hartford to obtain money for the Macheteros and its members to be used to fund its operations.

(March 28, 1989 Tr. at 147–48.) Thereafter, the court repeatedly instructed the jury to focus on the conspiracy thus alleged in the indictment:

[i]n the present case the Defendants are charged with conspiracy to violate Section[s] 659, 2113 and 2314 of Title 18, U.S.Code. In short, the object of the alleged conspiracy was to rob the Wells Fargo and then transport the stolen money safely out of the United States in an effort to fund Macheteros operations.

The essential elements of the offense of conspiracy, each of which the Government must prove beyond a reasonable doubt are, one, that two or more persons conspired to commit an offense against the United States; *namely*, violations of Sections 659, 2113, 2114 [*sic*] of Title 18.

Paragraph two, that the Defendant knowingly participated in *this* conspiracy with the intent to commit the offenses that were the object of the conspiracy.

And three, that during the existence of the conspiracy, at least one of the overt acts *set forth in the indictment* was committed by one or more of the members of the conspiracy in furtherance of the objectives of the conspiracy.

(*Id.* at 151–52 (emphasis added).) And again, after the excerpts quoted by appellants,

[i]f you find beyond a reasonable doubt that a conspiracy existed *as charged in the indictment*, and that during the existence of the conspiracy one or more of the overt acts alleged was knowingly done by one or more of the conspirators in furtherance of the objects of the conspiracy, proof of the conspiracy offense is then complete.

(*Id.* at 165 (emphasis added).)

In sum, appellants' contention that the court's instructions allowed the jury to convict on the basis of some conspiracy other than the one alleged in count 16 is unsupportable.

█ Further, to the extent that appellants contend that there was error in the court's failure to refer specifically to the

count 16 conspiracy when it instructed the jury that if it " 'f[oun]d that *there was a conspiracy* and ... that a particular defendant was a member of that conspiracy, then [it could] consider [his co-conspirators' declarations]' " (Segarra–Ramirez–Camacho brief on appeal at 30, quoting jury charge, March 28, 1989 Tr. at 160 (emphasis in brief)), the criticism is doctrinally flawed. Though, as discussed in Part III. B.2. above, Fed.R.Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment, *United States v. Dworken,* 855 F.2d 12, 24 (1st Cir.1988). Indeed, coconspirator statements are admissible if the prerequisites of Rule 801(d)(2)(E) are met even where no conspiracy offense is charged. *See United States v. Munson,* 819 F.2d 337, 343 (1st Cir.1987); *see also United States v. Stratton,* 779 F.2d 820 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986): "[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed.R.Evid. 801(d)(2)(E). The Government merely needs to demonstrate that the declarant and the defendants against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made...." 779 F.2d at 829.

Nor can we accept appellants' contention that the court's instructions permitted the jury to convict a defendant merely because he was a member of Los Macheteros. Appellants can point to no part of the instructions that so stated. Rather, the court properly advised the jury, *inter alia,* that "a conspiracy involves an agreement to violate the law," with the intent "to either do something which the law forbids or fail to do something which the law requires to be done" and that the "[m]ere association of alleged conspirators without any evidence of participation does not permit an inference of guilt." Nor, plainly, did the jury understand that it was to convict defendants of conspiracy on the basis of their membership in Los Macheteros. Ayes–

Suarez had conceded that he was a member of Los Macheteros, and he was acquitted.

In sum, we reject appellants' contention that the trial court's instructions impermissibly permitted the jury to convict them on count 16 on the basis of proof of a different conspiracy or merely on the basis of their associations.

## B. *Single vs. Multiple Conspiracies*

In connection with count 16, defendants argued that the robbery, the money transfers, and the gift giveaway need not be considered part of the same conspiracy, and they asked the court to instruct the jury that "[i]f you find that instead of proving one overall conspiracy with several different objectives, you find that the prosecution has proved that there were several distinct conspiracies, then you must acquit." They contend that the court's refusal to give this charge was error. We disagree.

Though where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury, *see, e.g., United States v. Orozco–Prada,* 732 F.2d 1076, 1086 (2d Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Bagaric,* 706 F.2d 42, 63 n. 18 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980), "if only one conspiracy has been alleged and proved the defendants are not entitled to a multiple conspiracy charge," *United States v. Martino,* 664 F.2d 860, 875 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *see United States v. Ocampo,* 650 F.2d 421, 429–30 (2d Cir.1981); *United States v. Cambindo Valencia,* 609 F.2d at 621 n. 15. Further, in order to secure a reversal for a failure to give a requested multiple-conspiracy charge, a defendant must show both that there was evidence of "separate networks operating independently of each other" and that he suffered "substantial prejudice resulting from the

failure to give the requested charge." *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir.1982); *see also United States v. Calabro*, 467 F.2d 973, 983 (2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1386, 35 L.Ed.2d 587 (1973).

■■■■ The essence of any conspiracy is, of course, agreement, and "in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Martino*, 664 F.2d at 876; *see also United States v. Cambindo Valencia*, 609 F.2d at 625–27 (multiple-conspiracy charge required where, *inter alia*, the only apparent connection among most of the coconspirators was that they were from Colombia). The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan. *United States v. Bagaric*, 706 F.2d at 63. The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d at 1192; *United States v. Heinemann*, 801 F.2d 86, 92 n. 1 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). Nor do lapses of time, changes in membership, or shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies. *See United States v. Martino*, 664 F.2d at 876–77; *United States v. Vila*, 599 F.2d 21, 24 (2d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). Indeed, it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found, *see, e.g., Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947); *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *United States v. Vila*, 599 F.2d at 24, especially where the activity of a single person "was central to the involvement of all," *United States v. Moten*, 564 F.2d 620, 625 (2d Cir.), *cert.*

*denied*, 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977).

■■■■ Finally, a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance. *See United States v. Tramunti*, 513 F.2d at 1106. Thus, the mere fact that an operation consists first of a robbery, planned and executed with the aid of an insider, and then of concealment of the money, executed by persons other than the insider, does not necessarily entitle the defendants to a multiple-conspiracy charge. *See United States v. Potamitis*, 739 F.2d 784 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). In *Potamitis*, we upheld the trial court's refusal to give such an instruction, noting that " 'where a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants.' " *Id.* at 788 (quoting *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978)).

■■■ The record in the present case did not justify a multiple-conspiracy charge, for it clearly showed only a single conspiracy that had several interdependent phases. Thus, Segarra planned the robbery with Gerena; Segarra and Ojeda–Rios purchased the getaway motorcycle and a motor home with which to transport the money. Segarra was also the temporary custodian of the stolen funds, and he kept Ojeda–Rios informed as to how much had already been taken to Mexico and how much was left in the United States. Camacho went from Puerto Rico to the home of Segarra's friend Gassin in Boston to customize a motor home for concealment of the last large transshipment of money, and in September 1984, Segarra and Camacho drove the money to Mexico in the customized motor home. As planned, they were followed into Mexico by Maldonado, who had just purchased a station wagon in Texas; the money was removed from the motor home, which was promptly sent back to

Massachusetts; the station wagon, presumably packed with money, was sent on to Puerto Rico. Maldonado's trip and the station wagon were paid for by Los Macheteros.

Maldonado was plainly an integral member of the operation. The Los Macheteros "Report of the Central Committee to the Congress" noted that "the main financial problem" of the organization was to have its existing assets "generate sufficient income to support the Party during the times of paralyzation or decrease in expropriation activity." In addition to participating in the September 1984 money move, Maldonado discussed with Ojeda–Rios investing the organization's funds in certificates of deposit. Maldonado also chaired organizational meetings at which certificates were discussed, and, as discussed in greater detail in Part V.D.2. below, he had possession of numerous documents relating to the inner workings of the conspiracy and describing the details of the planning of the robbery and movement of the proceeds, and other documents reflecting different views as to how the proceeds of the Wells Fargo robbery should be used.

The return of some of these funds to the Hartford area for use in the Three Kings' Day giveaway was organized by Segarra and Ramirez, and there was no indication that this was an independent conspiracy. Documents seized from the latter's residence reveal that Ramirez too was a member of the single conspiracy charged in count 16. Thus, he had at his home copies of, *inter alia,* Segarra's July 1984 notes on the planning of the robbery and a letter by Ojeda–Rios stating that a Segarra document would be distributed to "all the comrades." Copies of these documents were also found at the home of Avelino Gonzalez–Claudio. The Three Kings' Day party was what Los Macheteros termed their first use of the robbery proceeds, and some $50,000 of those proceeds were allocated to fund the celebration. Thereafter, Ramirez bought thousands of dollars worth of toys; on January 6, he dressed up as one of the three Wise Men to distribute the toys in Hartford; Segarra participated in a similar giveaway in Puerto Rico. Two days later

Segarra telephoned the press to claim credit on behalf of the organization for its benevolent use of the robbery proceeds. A document seized from the home of Ojeda–Rios's secretary, who acted as a bookkeeper for the conspirators, stated that "[i]t was agreed to congratulate all ... who participated in ... Three Kings [*sic*] Day activities in the United States as well as in Puerto Rico."

Thus, the trial evidence showed a completely interrelated operation. The indictment alleged and the record showed that the overarching goal of the conspiracy was the theft of a large amount of money to fund the activities of Los Macheteros. The robbery would have been unproductive without the transportation of the money; without the robbery, of course, there would have been no money to transport; and the Three Kings' Day giveaway was both the first activity to be funded by the robbery proceeds and a public relations move to soften criticism of the robbery.

We conclude that defendants have not met their appellate burden of showing the "likelihood of multiple conspiracies." There was no evidence suggesting "separate networks operating independently of each other."

Finally, even if it could have been inferred that there were several conspiracies, defendants are not entitled to reversal here because they have failed to meet their burden, *see United States v. Barlin,* 686 F.2d at 89; *United States v. Calabro,* 467 F.2d at 983, of showing prejudice from the district court's failure to give a multiple conspiracy charge. Plainly the evidence was ample to permit the jury to find beyond any reasonable doubt that all of the appellants were members of the single conspiracy alleged, and defendants have made no showing whatever of prejudice.

## V. OTHER ISSUES

Appellants jointly and individually also raise a number of other issues, including venue, eyewitness identification, the Sixth Amendment right to counsel, the admissibility of postarrest statements, jury selec-

tion matters, sufficiency of the evidence, and matters pertaining to sentencing. Except for one of Segarra's challenges to sentencing, none of these challenges has merit; only the following warrant discussion.

## A. *Venue Issues*

Prior to and during trial, defendants made several motions directed to venue. All of the appellants made pretrial motions (1) pursuant to Fed.R.Crim.P. 21(b) to transfer the prosecution to Puerto Rico for reasons of convenience, and (2) pursuant to Fed.R.Crim.P. 21(a) to transfer the trial to any district other than the District of Connecticut on the ground of prejudicial pretrial publicity. Appellants contend that the denial of these motions was error. In addition, after the close of the evidence, Segarra, Camacho, and Maldonado sought dismissal of counts 12 and 13 of the indictment for lack of connection with the District of Connecticut. Segarra and Camacho, the only appellants convicted on either of those counts, pursue this contention on appeal.

### 1. The Motion To Change Venue Because of Inconvenience

In May 1986, all but one of the defendants moved to have the prosecution transferred to Puerto Rico pursuant to Fed.R. Crim.P. 21(b), which permits the court, upon motion of the defendant, to transfer the proceeding to another district if such a transfer is appropriate "[f]or the convenience of parties and witnesses, and in the interest of justice...." These defendants argued, *inter alia*, that since they resided in Puerto Rico, proceeding in Connecticut would disrupt their businesses and be unduly expensive, and that because the conversations recorded on the surveillance tapes were largely in Spanish, defendants were entitled to have a Spanish-speaking jury.

In a *Ruling on Motion To Transfer Place of Trial* dated July 1, 1986 ("First Venue Ruling"), the district court denied the motions, concluding that there was little convenience to be gained and much to

be lost if the case were transferred. The district court observed that the residence of the defendants " 'has no independent significance in determining whether transfer to that district would be "in the interest of justice", although it may be considered with reference to such factors as the convenience of records, officers, personnel and counsel.' " *Id.* at 4–5 (quoting *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240, 245–46, 84 S.Ct. 769, 772–73, 11 L.Ed.2d 674 (1964)). The court found that though some of the planning and authorization for the robbery occurred in Puerto Rico, the substantive offenses were alleged to have occurred in Connecticut, in other mainland states, and in Mexico and Cuba. It concluded that "the primary evil occurred in Connecticut, the situs of the armed robbery which is the focus of this prosecution." First Venue Ruling at 7. It noted that though many of the documents had originally been in Puerto Rico, by the time of this venue motion they had all been brought to Connecticut at defendants' request and at the government's expense. Those witnesses who resided outside of Connecticut—a minority—would also be brought to Connecticut at government expense in light of the indigent status of most of the defendants.

The court further found that continuing the prosecution in Connecticut would have little disruptive effect on the businesses of the defendants, since most of them were being held in pretrial detention. Although there was one nonindigent defendant who was at liberty and would be adversely affected by having the prosecution remain in Connecticut, the defendant who did not join in the motion would be adversely affected by transfer of the case to Puerto Rico. The court noted that the expense to defendants of proceeding to trial in Connecticut rather than Puerto Rico was not a significant factor, since all but three of them had been granted *in forma pauperis* status, allowing the costs associated with their defense, including the expense of transporting witnesses from Puerto Rico, to be paid for them under the Criminal Justice Act, 18 U.S.C. § 3006A (1988) ("CJA").

The court also rejected defendants' contention that they were entitled to a Spanish-speaking jury, noting that even in Puerto Rico, all of the jurors would be required to be English-speaking, *see* 28 U.S.C. §§ 1865(b)(2) and (3) (1988). It found that defendants would not be unfairly prejudiced by not having a Spanish-speaking jury since the court had, under the CJA, ordered and arranged for translation and transcription of some 900 tapes by independent, court-certified interpreters.

Finally, the court noted that the transfer motion was belated, having been made some nine months after commencement of the prosecution, after discovery was nearly complete, after substantive motions had been filed, and on the eve of the court's setting a date for trial. The court pointed out that all of the defendants were currently represented by counsel of their own choosing from outside of Puerto Rico, most of them having put in some nine months of work on the case; it concluded that transfer to Puerto Rico, resulting in the need for local counsel to familiarize themselves with the case, would inevitably delay the trial.

Six months later, defendants renewed their Rule 21(b) motion. In a *Ruling on the Defendants' Motion To Change Venue, Federal Rules of Criminal Procedure 21(a)–(b),* dated January 27, 1987 ("Second Venue Ruling"), the court denied the renewed motion. Though noting that the circumstances had changed somewhat, in that seven of the defendants had recently been released from pretrial detention, the court found that most of the factors favoring retention of the case in the District of Connecticut remained.

■ Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court. *See, e.g., United States v. Stephenson,* 895 F.2d 867, 875 (2d Cir. 1990); *United States v. Keuylian,* 602 F.2d 1033, 1038 (2d Cir.1979). In deciding such a motion, the court should consider such factors as (a) location of the defendants; (b) location of the possible witnesses; (c) location of the events likely to be at issue; (d) location of relevant documents and records; (e) potential for disruption of the defendants' businesses if transfer is denied; (f) expenses to be incurred by the parties if transfer is denied; (g) location of defense counsel; (h) relative accessibility of the place of trial; (i) docket conditions of each potential district; and (j) any other special circumstance that might bear on the desirability of transfer, *id.; see Platt v. Minnesota Mining & Manufacturing Co.,* 376 U.S. at 243–44, 84 S.Ct. at 771–72. No one of these considerations is dispositive, and "[i]t remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Stephenson,* 895 F.2d at 875.

■ In the present case, the district court gave thorough consideration to all of the appropriate factors. We see no abuse of discretion, and we affirm the denial of the motions substantially for the reasons stated in the court's venue rulings.

### 2. The Motion To Change the Place of Trial Because of Pretrial Publicity

Appellants also moved unsuccessfully for a change of venue pursuant to Rule 21(a), which provides, in pertinent part, that

> [t]he court upon motion of the defendant shall transfer the proceeding as to that defendant to another district ... if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

Fed.R.Crim.P. 21(a). They contended that the adverse pretrial publicity in Connecticut was so prevalent as to prevent their receiving a fair trial. On these appeals, they pursue the argument that "official public statements coupled with the seditious language of the initial indictment, set the stage for an avalanche of prejudicial publicity about terrorism and the Macheteros that irreparably harmed Appellants [*sic*] right to a fair trial." (Maldonado brief on appeal at 52 (footnote omitted).)

■ In order to prevail on a motion under Rule 21(a), the defendant must show "a reasonable likelihood that prejudicial

news prior to trial will prevent a fair trial." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). In assessing the motion, the district court may take into account, *inter alia*, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially. *See generally* 2 C. Wright, *Federal Practice and Procedure, Criminal 2d*, § 342 (1982). The ultimate determination of whether unfavorable publicity renders a fair trial unlikely is committed to the district court's discretion, and we will overturn the denial of such a motion only upon a clear showing of abuse of that discretion. *See, e.g., United States v. Moran*, 236 F.2d 361, 362 (2d Cir.), *cert. denied*, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956). We find no such abuse here.

First, the district court held an evidentiary hearing on the issue of pretrial publicity, taking evidence as to the scope, nature, and provenance of the publicity, and hearing expert testimony on the subjects of publicity and jury selection. The court found that coverage by the *Hartford Courant* had been "continuing and prominent," Second Venue Ruling at 4, averaging slightly more than one article per week over a three-year period, but concluded that the coverage was neither massive nor pernicious. The articles tended to focus on the robbery itself and on Gerena and the Macheteros organization rather than on any of the defendants before the court. Many of the articles were simply factual accounts of the frequent court proceedings, and only one out of 173 articles mentioned the name of a defendant in a headline. So little prominence was given to the individuals other than Gerena that defendants' own expert, after reading the articles, had been "unable to name a single defendant on trial in this case." *Id.* at 5.

Further, the court found that though the government had issued press releases regarding the prosecution, those releases for the most part merely documented the names and addresses of the individual defendants and the offenses with which they were charged, factual information whose publication is authorized by 28 C.F.R. § 50.2. The court found that though another government press release attributed certain other violent acts to Los Macheteros, this release described acts not at issue in the present prosecution and did not mention any of the present defendants. Thus, the court found that this release was not so inherently prejudicial as to deny these defendants a fair trial. The court also found that some of the pretrial publicity had been generated by the defendants themselves. Segarra had written a newspaper article, as well as a letter to the press that led to another article. Another defendant had discussed the case in an interview on television.

We see no error in these findings, and in all the circumstances, we conclude that the district court's denial of the pretrial motion to change the place of trial was not an abuse of discretion.

As to the trial phase, the court made every effort to prevent exposure of the jurors to the continuing flow of publicity generated by the trial. At the close of each day's session, the court admonished the jury to avoid reading about the case in the newspapers or hearing about it on radio or television. At the start of each trial day, the court asked for assurance from each juror as to whether these instructions had been followed.

Finally, the verdicts returned in this case perhaps provide affirmative evidence that the jury was not influenced by publicity unfavorable to the defendants. After nine days of deliberation, the jury returned painstaking verdicts in which it acquitted most of the defendants on at least one charge. It found Segarra not guilty on five counts, and it acquitted Ayes–Suarez entirely. We conclude that the publicity attending this prosecution did not deny appellants a fair trial.

3. Venue with Respect to Counts 12 and 13

Count 12 of the indictment charged Segarra with violation of 18 U.S.C. §§ 2314

and 2 in connection with the March 27, 1984 transportation of stolen money to Mexico. Count 13 charged Segarra and Camacho with violation of those sections in connection with the transportation of money to Mexico in September 1984. After the close of the evidence at trial, they moved for acquittal on these counts on the ground that the government had failed to establish venue in the District of Connecticut. In a published opinion, *United States v. Gerena,* 709 F.Supp. 52 (1989), the district court properly denied this motion.

■ The venue provisions of the Constitution and Rule 18 of the Federal Rules of Criminal Procedure give a defendant the right to be tried in a district in which the offense with which he is charged was allegedly committed. U.S. Const. Art. III, § 2 ("trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed"); Fed.R.Crim.P. 18 ("[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed"). When a defendant is charged in more than one count, the government must establish venue with respect to each count. *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d at 1188.

■ In order to prove venue, the prosecution must show, by a preponderance of the evidence, that some part of the crime was committed within the district of the prosecution. *United States v. Potamitis,* 739 F.2d at 791; *United States v. Panebianco,* 543 F.2d 447, 455 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). With respect to certain offenses that were begun in one district and completed in another, Congress has given specific instruction as to where the crime is to be deemed committed. Thus, it has provided that "[a]ny offense involving ... transportation in interstate or foreign commerce ... is a continuing offense and ... may be inquired of and prosecuted in any district from, through, or into which such commerce ... moves." 18 U.S.C. § 3237(a).

■ There can be no doubt that the § 2314 offense charged in counts 12 and 13 is a "continuing offense," since it involves the "transport[ation]" of stolen goods or money "in interstate or foreign commerce." 18 U.S.C. § 2314. Further, the indictment properly alleged venue, as both count 12 and count 13 asserted that the defendants named in those counts had knowingly transported stolen money "in foreign commerce *from the State and District of Connecticut* to Mexico." (Emphasis added.) Nor is there any doubt that the government proved at trial that the moneys transported to Mexico were proceeds of the Wells Fargo robbery in Connecticut; thus Connecticut is a district "from" which the money was transported in foreign commerce.

■ Segarra and Camacho acknowledge both the sufficiency of the indictment and the nature of the proof at trial. They argue, however, that a pretrial ruling of the district court on a motion that raised a different problem with respect to a different count, effectively eliminated from counts 12 and 13 any reference to Connecticut as the source of the stolen money. We disagree.

Count 10 of the indictment charged Segarra and others with violating 18 U.S.C. § 2314 by the transport of stolen money from Connecticut to Massachusetts on or about September 12, 1983. Counts 11–13 charged most of the same defendants, plus others, with transportation of stolen money from Connecticut to Mexico (a) between September 12 and September 27, 1983 (count 11), (b) between September 12, 1983, and March 27, 1984 (count 12), and (c) between September 12, 1983, and September 23, 1984 (count 13). Prior to the trial of appellants, several defendants, contending that these four counts were multiplicitous, moved for their dismissal or, alternatively, for an order compelling the government to elect which counts they would prosecute. In a *Ruling on Isaac Camacho Negron's Motion to Dismiss Counts Ten Through Thirteen or To Compel Election–Multiplicity* dated November 20, 1986 ("Multiplicity Ruling"), the district court denied

the motion, finding that the four counts were not multiplicitous. Noting that " '[u]nder 18 U.S.C. § 2314, each interstate or foreign transportation of stolen securites [*sic*] constitutes a separate violation of § 2314 even if the various acts of the transportation are part of a single scheme,' " Multiplicity Ruling at 2 (quoting *United States v. Johnpoll*, 739 F.2d 702, 714 (2d Cir.), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984)), the court concluded that

> the alleged transportation of money from Connecticut to Massachusetts on September 12, 1986 [*sic:* 1983], and the three claimed acts of transportation to Mexico between September 12, 1983 and September 27, 1983, between September 12, 1983 and March 3 [*sic:* March 27], 1984, and between September 12, 1983 and September 23, 1984 are four separate acts of transportation; they are four separate violations of the statute.

Multiplicity Ruling at 2. Since each transportation of a different portion of the money could properly be treated as a separate unit for prosecution under § 2314, the court found that "count ten which alleges the transportation of money into Massachusetts is not contained within counts 11, 12, or 13." Multiplicity Ruling at 4.

Segarra and Camacho contend that the court's statement that count 10 was not contained within these other counts served to "amend[ ] the allegations in counts twelve and thirteen," and thus "precluded the prosecution from relying on the origination of the money in Connecticut to satisfy venue." (Segarra–Ramirez–Camacho brief on appeal at 45, 47.) This argument is sophistry. The district court noted that its November 20, 1986 Ruling pertained only to the issue of multiplicity and did not deal with the question of venue. We agree.

A claim of multiplicity requires the court to determine whether an indictment charges a single offense in more than one count.

> The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which "assur[es] that the

court does not exceed its legislative authorization by imposing multiple punishments for the same offense."

*United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)). Where the counts in question charge violations of different statutory provisions—*i.e.*, different statutes, different sections, or different provisions in a given section—the multiplicity inquiry requires analysis of whether the offenses charged in the various counts are sufficiently distinguishable from one another to permit a reasonable inference that Congress intended to authorize multiple punishments. *See, e.g., United States v. Nakashian*, 820 F.2d at 551; *United States v. Marrale*, 695 F.2d 658, 662 (2d Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1434, 75 L.Ed.2d 793 (1983). The ruling that count 10, which charged the transportation of stolen money in interstate commerce, was not the same offense as counts 11, 12, or 13, all of which charged transportation in foreign commerce, was a ruling that the offense of transportation in foreign commerce may be established without proof of such transportation in interstate commerce and that the elements of various offenses were sufficiently distinguishable from one another that prosecution of all of them would not constitute double jeopardy.

Venue, however, is not an element of the offense. *United States v. Griley*, 814 F.2d 967, 973 (4th Cir.1987). Unlike multiplicity considerations, venue provisions deal not with whether prosecution of a given charge is permissible but only with that prosecution's permissible location. Thus, a ruling that two counts are not multiplicitous, which focuses on the elements of the offenses, does not affect the need or the ability of the government to prove a nonelement such as venue. We conclude that the district court's Multiplicity Ruling did not "amend" the indictment and that the motions of Segarra and Camacho to dismiss counts 12 and 13 for failure of proof as to venue were properly denied.

### B. The Selection and Treatment of the Jury

Defendants also contend that they were denied a fair trial by reason of (1) underrepresentation of Hispanics and Puerto Ricans on the grand·and petit jury venires, (2) the court's failure to conduct an adequate voir dire, and (3) prejudicial use of security measures in the treatment of the jury. These contentions lack merit.

#### 1. The Claim of Hispanic Underrepresentation

Prior to trial, defendants moved to· dismiss the indictment on the ground that the jury system used in the Hartford and New Haven divisions of the District of Connecticut resulted in underrepresentation of Hispanics and Puerto Ricans in the grand and petit jury venires, in violation of their rights under the Sixth Amendment and 28 U.S.C. §§ 1861–1878 (1988). In support of their motion, they introduced, *inter alia,* expert opinion concluding that there was "very significant adverse impact against Hispanics and Puerto Ricans" in the jury selection system.

In a published opinion, *United States v. Gerena,* 677 F.Supp. 1266 (1987), familiarity with which is assumed, the court denied the motion. The court rejected defendants' statutory claim because of their noncompliance with § 1867(d), which requires that a motion challenging jury selection procedures under § 1867 be supported by a sworn statement of facts. Despite having had this provision called to their attention at an early hearing, defendants submitted no sworn statement.

▇▇▇▇ The court denied the constitutional claim on the ground that defendants had not shown that Hispanics and Puerto Ricans "are 'substantially' underrepresented on the grand and petit jury venires in the New Haven and Hartford Divisions." 677 F.Supp. at 1274. Using the statistics proffered by defendants' expert and an "absolute impact" approach, *see United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975), the court found that the underrepresentation of Puerto Ricans was

at most 1¼ in a jury venire of 60 persons. Rounding this to a whole-person number of one, the court found that the discrepancy was the same as that found insignificant in *Jenkins.* Though defendants urge us to find that *Jenkins* is no longer the benchmark for claims of unconstitutional underrepresentation, relying on language in *Alston v. Manson,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), to the effect that "the absolute disparity approach employed in *Jenkins* may be outmoded and should be discarded," *id.* at 259, we have more recently declined to reexamine the *Jenkins* approach, *see United States v. Rosario,* 820 F.2d 584, 585 (2d Cir.1987), and we decline to do so here.

Defendants have not shown any error in the district court's legal analysis or factual findings. We affirm substantially for the reasons stated in the district court's opinion.

#### 2. The Adequacy of the Voir Dire

Defendants also contend that the district court's voir dire of prospective jurors was not adequate to probe potential areas of prejudice. They contend, *inter alia,* that the court should have granted them additional peremptory challenges and should have excused for cause jurors with backgrounds in law enforcement or the military, and jurors employed by banks. We find no basis for reversal.

▇▇▇▇ The conduct and content of the voir dire are entrusted to the broad discretion of the trial judge. *United States v. Barton,* 647 F.2d 224, 230 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Barnes,* 604 F.2d 121, 137 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The judge decides what questions may be addressed to the jury panel, and "although the questioning must be fair, it need not include specific points requested by a particular defendant." *United States v. Tutino,* 883 F.2d at 1133. The court is not required to excuse any juror on the basis of his occupa-

tional background so long as the court is able to conclude that the juror would be able to view the evidence with impartiality and to decide the case without bias. We see no abuse of discretion in the present case.

▬ In conducting the voir dire here, the court prepared a written questionnaire consisting of 65 questions tailored to the facts of this case. The court then orally asked several general questions relating to pretrial publicity. The defendants were permitted to submit proposed supplemental questions, and the court gave each defense attorney 15 minutes to ask "any legitimate question" of individual prospective jurors. Defendants have not called to our attention any question they wished to ask that was not allowed. We conclude that the voir dire questioning was not unduly curtailed.

▬ Nor does it appear that the court abused its discretion with respect to the number of peremptory challenges allowed. Ordinarily, defendants would have been entitled to a total of 10 such challenges. *See* Fed.R.Crim.P. 24(b) (where offense charged is punishable by imprisonment for more than one year, defendants jointly are entitled to 10 peremptory challenges; court has discretion to allow more). Here the court granted three peremptory challenges to each defendant, giving a total of 15 for the 12–person jury. In addition, the court allowed defendants five peremptory challenges that could be exercised with respect to the proposed alternate jurors.

In short, we conclude that defendants were afforded an appropriate opportunity to ferret out prejudices and excuse potentially biased jurors, and that there is no basis for believing that the procedures were not adequate to ensure an unbiased jury.

### 3. The Use of Security Measures

In the belief that Los Macheteros had been responsible for a number of violent acts in addition to the Wells Fargo robbery, the government urged the court to adopt a number of security measures to protect the jury from harm or intimidation. Acceding to this request, the court, *inter alia*, or-

dered that the identities of the individual jurors remain undisclosed, arranged for secure transportation for the jurors to and from court, and had substantial numbers of armed guards on the premises. Defendants contend that the measures adopted created an atmosphere in which it was impossible for the jury to view them without bias. We disagree.

▬ The district court has broad discretion to take such steps as may be necessary and appropriate to permit the jury to concentrate on the trial proceedings and to evaluate the evidence in an atmosphere free from apparent threat or danger, so long as those steps do not violate the defendant's fundamental rights. The measures at issue here did not interfere with defendants' rights to a fair trial. All of their specific fundamental rights, such as the right to be present at trial, the right to a voir dire designed to result in the selection of impartial jurors, and the right to present evidence, were preserved. Further, the court's explanation of security measures to the jury was couched in neutral terms carefully designed not to introduce any bias against these defendants or Los Macheteros in general. For example, the court explained that anonymity was being preserved in an effort to "ward off curiosity and seekers for information that might otherwise infringe on your privacy, and it will aid in insulating and sheltering you from unwanted and undesirable publicity and embarrassment and notariety [*sic*], and any access to you which would interfere with preserving your sworn duty to fairly and impartially and independently serve as jurors." (September 20, 1988 Tr. at 23–24.)

We conclude that the court's concerns for safety were grounded in objective facts and that the measures it took were well within the proper bounds of discretion.

### C. *The Claims of Camacho*

Camacho raises a number of individual claims on appeal. The two that warrant discussion are his contentions that the district court should have (1) suppressed cer-

tain of his postarrest statements, and (2) precluded Gassin's identification of him at trial. For the reasons below, we reject these contentions.

### 1. The Postarrest Statements

Camacho was arrested in March 1986, following which he made several statements. They included principally (1) the statement that he was surprised that he had not been arrested along with other defendants in August 1985 and that he had been expecting the FBI since that time, and (2) a question to the agents as to whether they expected to find "some of that money" in his car. Prior to trial, Camacho moved to suppress these statements on the ground that they were a product of custodial interrogation in violation of his Fifth and Sixth Amendment rights.

The district court held a two-day evidentiary hearing at which the government presented testimony from the three FBI agents to whom the statements were made. Camacho did not testify. In a *Ruling on Defendant Antonio Camacho Negron's Motion To Suppress Evidence from His Home and Car and Oral Statements* dated March 17, 1988, the court found that prior to leaving the scene of the arrest, an FBI agent informed Camacho of his *Miranda* rights and gave those rights to him in Spanish at his request; that Camacho stated he understood his rights; that Camacho stated that he would not sign a waiver form "out of principle," but did not invoke his *Miranda* rights. The court found that the statements as to which suppression was sought were made during the ensuing one-hour drive, and that during that drive, Camacho neither invoked his right to remain silent nor asked for an attorney. The court found that the statements quoted above either had been volunteered or were freely given responses to inquiries, and hence were not the product of impermissible interrogation and should not be suppressed.

Camacho contends that he was intimidated and coerced into making the statements and argues that the district court's ruling to the contrary should be reversed on the ground that the only evidence that his *Miranda* rights had been protected was the testimony of the FBI agents, which should have been rejected as "self-serving." He also argues, relying on *United States v. Mohabir*, 624 F.2d 1140 (2d Cir.1980), that his statements should have been suppressed as a violation of his Sixth Amendment right to counsel since he was not specifically warned of his status as an indicted defendant, and the ramifications of his waiver were not explained to him by a judicial officer. None of his contentions has merit.

The district court's findings of fact following a hearing on a motion to suppress must be upheld unless they are clearly erroneous. *See, e.g., United States v. Koskerides*, 877 F.2d at 1131; *United States v. Isom*, 588 F.2d 858, 862 (2d Cir. 1978) (defendant's understanding of *Miranda* warnings). Assessments of the credibility of witnesses are the province of the district court and we are not entitled to overturn those assessments. *See, Anderson v. Bessemer City*, 470 U.S. at 574, 105 S.Ct. at 1511–12. Where there are two permissible views of the evidence, the court's choice between them cannot be deemed clearly erroneous. *Id.*

The court's findings here were not clearly erroneous. Camacho did not testify at the hearing in support of his contention that he had been coerced into making the statements. Rather, he relied on unsworn and unsigned "declaration[s]" by his wife and himself, and an affidavit by his attorney. The court properly declined to credit the attorney's affidavit because it was not based on the attorney's personal knowledge and declined to credit the "declaration[s]" because they were not sworn to or even signed. The court found there was no evidence of any threats of force. There was, on the other hand, testimony from the agents that clearly supported the court's findings that Camacho had been given his rights, had stated he understood, had not been intimidated, had not invoked his right to remain silent, and had not requested an attorney. The district court was entitled to credit that testimony, and

we see no basis for overturning its findings.

Camacho's reliance on *Mohabir* is also unavailing. In *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the Supreme .Court expressly "reject[ed] *Mohabir*'s holding that some 'additional' warnings or discussions with an accused are required in th[e postindictment] situation, or that any waiver in this context can only properly be made before a 'neutral ... judicial officer.'" *Id.* at 296 n. 8, 108 S.Ct. at 2397 n. 8. The *Patterson* Court stated that, "[s]o long as the accused is made aware of the 'dangers and disadvantages of self-representation' during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" *Id.* at 299–300, 108 S.Ct. at 2399.

We conclude that the motion to suppress the post-arrest statements was properly denied.

### 2. The Identification of Camacho by Gassin

At trial sessions in February 1989, Gassin testified that Camacho was the man who had come to her house in Boston in September 1984 to prepare the motor home, which was then behind her house, for the transportation of part of the Wells Fargo money to Mexico. She had difficulty in identifying Camacho at trial, however, until after she reviewed a photographic array from which she had selected Camacho's picture in September 1985. Camacho contends that the admission of Gassin's identifications of him violated his Fifth Amendment rights because (a) the photographic array was impermissibly suggestive, and (b) in any event, the in-court identification was solely the product of Gassin's recent review of the photographic array. We find no error.

The linchpin for admissibility of identification testimony is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 106–07 n. 9, 114, 97 S.Ct. 2243, 2249 n. 9, 2253, 53 L.Ed.2d 140 (1977). In reviewing a due process challenge to the admission of such testimony, we must look at the facts of each case and the totality of the surrounding circumstances. *See id.; Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968); *accord Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The ultimate questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the circumstances, there is "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971; *see Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

When a witness has made a pretrial identification, the analysis of whether he is to be permitted to identify the defendant at trial normally requires a one-step or two-step inquiry. The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt. If they were not, the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification. In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility. *See, e.g., Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986).

If the pretrial procedures were unduly suggestive, the analysis requires a second step; the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures. *See Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *Sims v. Sullivan*, 867 F.2d 142, 145 (2d Cir.1989); *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir.1982). The factors to be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the

confrontation." *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382; *accord Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. A lengthy interval between the event and the identification is not determinative if it is outweighed by other indicia of reliability. *See, e.g., Neil v. Biggers*, 409 U.S. at 200–01, 93 S.Ct. at 382–83; *United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989) (10–month interval outweighed by the other indicia of reliability); *United States v. Williams*, 596 F.2d 44, 49 (2d Cir.) (even 32–month delay may be offset by factors demonstrating strong reliability), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

■ The fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents. If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs or of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984)). The array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator. In *United States v. Fernandez*, 456 F.2d 638, 641–42 (2d Cir.1972), in which surveillance photographs showed a robber to be a light-skinned individual with an Afro haircut, we held that the use of a six-photo array where only one of the six even "remotely resemble[d]" that description was impermissibly suggestive. But we noted that if that array had been combined with another five-photo array that included one other light-skinned Black man with an Afro, the resulting 11–photo array with two persons matching the robber's characteristics would not have been impermissibly suggestive.

■ The appellate court may review the array to assess the fairness of its contents. *See United States v. Jacobowitz*, 877 F.2d at 168; *United States v. Archibald*, 734 F.2d at 940; *see also United States v. Sanchez*, 603 F.2d 381, 384 (2d Cir.1979). We have reviewed the array, as well as all the circumstances surrounding Gassin's identification of Camacho, and, for the reasons below, we find no error in the admission of the pretrial or the in-court identification.

■ Gassin was arrested on August 30, 1985, and soon entered into a cooperation agreement with the government. She described, *inter alia*, meeting Camacho, though she could not recall the name by which Segarra had introduced him. She first met Camacho on September 16, 1984, upon his arrival from Puerto Rico; she and Segarra picked Camacho up and took him to Weinberg's home. During that drive, Gassin sat in the back seat of the car with Camacho, about two feet away from him, and conversed with him. The time was late afternoon; the lighting was good. Thereafter, Camacho spent several days at Gassin's home, customizing the motor home, and she saw him often during that time. Gassin described Camacho to the FBI in September 1985 as a Puerto Rican man in his 30's who had a small stature, was balding or losing some of his hair, and had a small beard. Some days later, the agents showed Gassin a group of nine black-and-white photographs, and she selected from the group the photograph of Camacho.

The size of the array, nine photographs, was not so small as to cause undue focus on Camacho. Nor is there any indication in the record that the manner of its presentation was flawed. We have reviewed the contents of the array and do not find it to be suggestive. The ethnicity of the nine persons depicted is indeterminate, and the majority may well be Hispanic. All but one or two of the subjects appear to be in their 30's. All nine have a small amount of facial hair. Two appear to be balding, and two others have hairlines that may be receding. In sum, several of the persons depicted met Gassin's description of Cama-

cho, and there was no feature of Camacho's photo that made his stand out from all the rest.

Though under the above authorities our ruling that the photographic array was not impermissibly suggestive would normally result, without further inquiry, in the admissibility of the in-court identification, Camacho contends that the trial court erred here in allowing such an identification because, as described below, at a *Wade* hearing just prior to her trial testimony, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Gassin had been unable to identify Camacho in the audience. This circumstance does indeed introduce a need for further consideration. After giving due consideration to all the pertinent circumstances and principles, however, we conclude that there is no basis for reversal.

At the *Wade* hearing, conducted with the jury absent, Gassin was asked whether she could identify Camacho among the persons seated in the spectator section of the courtroom. She could not:

Q. Do you recognize anyone, Ms. Gassin?

A. No, I don't.

. . . .

Q. Ms. Gassin, when I asked you if you saw the man who came from Puerto Rico here in the courtroom today, you said, "No." Are you saying that that man is definitely not here or that you simply cannot recognize anyone right now?

A. I can't recognize someone in this room who resembles the memory I have of the person that I met in September 1984.

THE COURT: Was there anything peculiar about this person's resemblance?

THE WITNESS: The image I have of his face and his eyes, his beard, I don't recognize in someone here.

(February 2, 1989 Tr. at 38–39.)

Thereafter, still at the *Wade* hearing, Camacho sought to show that Gassin's initial identificatin of him was tainted by an impermissibly suggestive photographic array. Gassin was thus questioned about her photographic identification of Camacho in 1985. She described the process and, when shown the array, selected his picture again. Camacho thereafter sought to preclude any in-court identification by Gassin. Though noting no further objection to introduction of the photographic identification, Camacho's attorney stated as follows:

MS. BACKIEL: . . . . My position is what she may not do now before the jury is be asked, after having failed to identify and after having been shown the photograph, whether she can now identify him because, as a matter of law, that identification will only be the fruit of her viewing the photograph.

(*Id.* at 150.) The court overruled Camacho's objection, reasoning that the government was entitled to refresh a witness's recollection and that Camacho could explore any frailty in the in-court identification through cross-examination.

Accordingly, when the jury returned to the courtroom, the government proceeded to ask Gassin if she could identify Camacho in the courtroom. This time, she found Camacho among the spectators. She asked to have him stand, and when he did so, she identified him. When questioned about her inability to identify Camacho at the *Wade* hearing, Gassin said she was not sure that it had not helped her to see the photograph again; but she explained that her first effort to identify Camacho took place just after she had taken the witness stand and she had been very nervous. Though instructed to take all the time she needed, she said she had not done so because she was nervous, and she had not seen Camacho during the *Wade* hearing. She also said that in the more than four years since she had last seen him, Camacho had gained weight and had shaved off his beard.

We find no error in the ruling of the district court permitting Gassin, in the presence of the jury, to attempt to identify Camacho among the spectators notwithstanding her earlier failure to do so at the *Wade* hearing. Though the prosecutor may not properly engage in procedures that are designed to manufacture an identi-

fication where there was in fact no recognition or to turn a tentative identification into one that is certain, *see, e.g., Solomon v. Smith*, 645 F.2d 1179, 1185–87 (2d Cir. 1981), a party is generally entitled to attempt to refresh a witness's recollection, *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976), provided there is a foundation for believing that the witness once had knowledge of the fact as to which his recollection is to be refreshed, *see generally* 3 *Wigmore on Evidence* §§ 725, 726, 758 (Chadbourn rev. ed. 1970); *id.* § 725 ("recollection should (so far as can be expected) *correspond to and represent the impressions originally gained by observation*" (emphasis in original)). The proper foundation in the context of identification of a defendant in a criminal trial requires, as a minimum, a basis for finding that the witness had in fact observed the perpetrator. If the process of refreshing the witness's identification had been improperly suggestive, we would apply the *Neil v. Biggers* factors discussed above, *i.e.*, opportunity, alertness, accuracy of description, initial level of certainty, and interval between the last viewing and the first identification. Where, as here, the means of refreshing the recollection was the display of an unsuggestive array of photographs, our touchstone is the witness's actual observations prior to any law enforcement involvement.

In the present case, Gassin plainly had observed Camacho prior to any viewing of his photograph since, *inter alia*, she had been introduced to him and had conversed with him, and he had stayed with her at her home for several days. This was an adequate foundation to permit Gassin to identify Camacho with refreshed recollection. Further, even application of the *Neil v. Biggers* factors would have warranted allowing the in-court identification. For example, in addition to having had an unusually good opportunity to observe Camacho, she was hardly likely to have been either oblivious to him or overwrought by his presence, for she was a coconspirator and he was introduced to her as a fellow coconspirator. *See, e.g., United States v. Marchand*, 564 F.2d 983, 985–86 (2d Cir. 1977) (identification by accomplice tends to be inherently more reliable than identification by victim or law enforcement officer who sees perpetrator for only a short time), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). Further, there seems to be no question that in appearance, Camacho closely matched Gassin's general description of him. And though Camacho argues that the interval of nearly a year between Gassin's last meeting with Camacho and her identification of his photograph makes that identification suspect, the length of that interval is outweighed by her extended opportunity to become familiar with his appearance, her likely alertness, and the accuracy of her prior descriptions. The fact that Gassin could not pick Camacho out of the audience during the *Wade* hearing was undoubtedly relevant. But in all the circumstances, the import of that inability went only to the weight, not to the admissibility, of her eventual in-court identification.

We conclude that there was no likelihood of misidentification and that the identifications were properly admitted.

### D. *The Claims of Maldonado*

Maldonado represented himself at trial. On this appeal, he claims, *inter alia*, that in allowing him to proceed *pro se*, the district court violated his Sixth Amendment right to counsel because it failed to "address [him] directly concerning his decision to proceed *pro se*, and to admonish [him] concerning the dangers of proceeding *pro se*." (Maldonado brief on appeal at 67.) He also contends that the evidence was insufficient to support his conviction of conspiracy. We reject all of his contentions.

### 1. Waiver of the Right to Counsel

■ A person accused of a crime has the right to conduct his own defense. *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975). However, one who chooses to represent himself at a criminal trial gives up substan-

tial benefits, and he should not be allowed to forgo those benefits unless he does so knowingly and intelligently. *Id.* at 835, 95 S.Ct. at 2541; *see also United States v. Tompkins,* 623 F.2d 824, 827–28 (2d Cir. 1980) ("there can be no waiver of the right to counsel absent a purposeful choice reflecting an unequivocal intent to forego the assistance of counsel"). Though the defendant himself need not have the skills and experience of a lawyer to validate his choice, there must be assurance that he has been "made aware of the dangers and disadvantages of self-representation." *Faretta v. California,* 422 U.S. at 835, 95 S.Ct. at 2541.

▮▮▮▮▮ In order to assure itself that the accused's election to represent himself is made knowingly and intelligently, the court must ordinarily explore the facts and circumstances surrounding the case, including " 'the background, experience, and conduct of the accused.' " *United States v. Tompkins,* 623 F.2d at 827 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Though such an examination will normally entail formal questioning of the defendant, the "requirement of such a 'full and calm discussion,' ... is not absolute," *United States v. Tompkins,* 623 F.2d at 828, so long as the record plainly reveals that the defendant's choice was knowing and intelligent. When the defendant is or has been a practicing attorney, it may well be possible to ascertain the state of his knowledge from the record despite the lack of the preferred direct questioning. In *United States v. Campbell,* 874 F.2d 838 (1st Cir. 1989), which involved an attorney defendant, the court stated that while "such on the record findings are almost always wise, they are not mandated," *id.* at 845, and that on the record before it, it was "highly improbable that [an attorney] with such experience in the criminal justice system and knowledge of the law could be ignorant of the effect of a waiver of legal representation," *id.* at 846. We have stated even in the case of a non-attorney that "[i]f the defendant has willfully waived his right to counsel ... the failure explicitly to inform the accused of the consequences of

proceeding without an attorney does not require reversal of his conviction." *United States v. Tompkins,* 623 F.2d at 828.

▮▮▮▮ Though the district court here did not follow the preferred practice of closely questioning Maldonado's awareness of the benefits of being represented by counsel, the record makes clear beyond doubt that Maldonado was fully informed and that his election was knowing and intelligent. Maldonado first asserted his right to represent himself at arraignment. He was at that time accompanied by counsel. As soon as he was sworn, the court sought to "make clear on the record" that Maldonado was in fact an attorney. Maldonado stated that he was and that he was admitted to practice in the Supreme Court of Puerto Rico and the federal district court there. The court asked, "So, actually, you pretty much know what your legal rights are?" Maldonado stated that he did, that he was President of the Human Rights Institute of Puerto Rico, that he had represented numerous defendants in court, and that he "ha[d] a very long track record of defending human rights cases in Puerto Rico. And defending, also, pro independence activists." Maldonado stated that he had represented Ojeda–Rios and others of his present codefendants in various matters, including criminal cases. Indeed, he informed the court that he had in fact been co-counsel for Ojeda–Rios in this very prosecution.

Maldonado's statements and conduct throughout the proceedings reflected his familiarity with the workings of the legal system and with the options legally available to him. For example, when asked whether he had been served with a copy of the indictment, Maldonado responded, "Yes, your Honor. I would like to waive the reading of the indictment. I have a copy. I have read it and understand it." At various times he requested additional time to file papers, filed a waiver of appearance stating that he understood all the charges against him, and, when it suited him, he retained counsel to represent him. Thus, he had an attorney at his arraignment who was to be his "legal adviser"

with respect to the negotiation and posting of bond; he later had another attorney, William M. Kunstler, make a pretrial motion for him; and he eventually retained a third attorney to make posttrial motions for him and represent him at sentencing. Prior to trial, Kunstler indicated to the court, in Maldonado's presence, that he had discussed the matter of representation with Maldonado and that Maldonado was steadfast in his desire to represent himself at trial. When the court suggested that perhaps counsel should be appointed notwithstanding that desire, Kunstler repeatedly cited *Faretta* and argued that the court should be particularly reluctant to appoint counsel when the defendant who wished to proceed *pro se* was an attorney.

At trial, Maldonado was the only defendant to present any defense. He called character witnesses, who, *inter alia,* testified to his experience as a criminal defense lawyer. One of these witnesses was his own sometime attorney, Kunstler. At the close of the government's evidence, Maldonado moved (successfully) to dismiss the two Hobbs Act counts against him; at the close of all the evidence, he gave a summation (successfully with respect to count 13, on which he was acquitted). Plainly the record indicates that Maldonado was an experienced attorney, well versed in the law and in criminal procedure, aware of the benefits of representation by counsel, able to choose to be represented by counsel on matters on which he believed that advisable, and knowingly insistent on representing himself in all other respects.

Finally, we note that Maldonado does not even argue that his election was not in fact knowing or intelligent or that the record as a whole does not indicate that it was knowing and intelligent. His only complaint is that the court did not engage in the normal catechism to elicit information from him that in large part was already evident in the record. In all the circumstances, we cannot say that the court erred in failing to perform an explicit on-the-record inquiry into this defendant's waiver of the right to be represented by counsel.

### 2. Sufficiency of the Evidence

The only offense of which Maldonado was convicted was the count 16 conspiracy to commit bank robbery and transport the robbery proceeds in interstate and foreign commerce. He contends that the evidence was insufficient to support his conviction. We disagree.

In making such a sufficiency argument, a defendant bears a heavy burden. *United States v. Chang An–Lo,* 851 F.2d 547, 553 (2d Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Esdaille,* 769 F.2d 104, 108 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985); *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing sufficiency, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942), crediting every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d at 64; *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Buck,* 804 F.2d at 242; *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States,* 315 U.S. at 80, 62 S.Ct. at 469–70; *United States v. Tutino,* 883 F.2d at 1129 (existence of and participation in a conspiracy with the requisite criminal intent may be established through circumstantial evidence).

Pieces of evidence must be viewed not in isolation but in conjunction. *United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S.

1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). The conviction must be upheld if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■■■ Maldonado has not met his burden. He claims that the evidence shows only that he crossed the border into Mexico at the same time as the motor home brought from Massachusetts by Segarra and Camacho in September 1984 and therefore shows at most that he was a member of only a very limited conspiracy related only to that money transfer. His argument ignores a great deal of evidence and gives no deference whatever to the applicable legal principles. We have discussed in Part IV above the principles applicable to proof of a charge of conspiracy, and have noted that the evidence was sufficient to establish a single conspiracy to commit the Wells Fargo robbery and transport the proceeds in interstate and foreign commerce. Thus, Maldonado's conviction must be upheld if there was evidence from which the jury could reasonably have inferred that he knew of that conspiracy and knowingly joined and participated in it. *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989); *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984).

The evidence was ample to permit the jury to infer that Maldonado knew of and was a member of the conspiracy charged. Plainly the record showed that in September 1984, he went to Texas and there purchased a station wagon; he joined up with Segarra and Camacho, who were driving the money-laden motor home, and followed them into Mexico; the motor home was sent back to Massachusetts, and the station wagon was promptly shipped to Puerto Rico. It was permissible for the jury to infer from these events that the money was transferred from the motor home to the station wagon provided by Maldonado for shipment to Puerto Rico, and that Maldonado thus knowingly participated in the September 1984 money move.

The record also easily permitted the jury to infer that Maldonado was a trusted member of the conspiracy long before and long after that moment, for a number of documents central to the conspiracy were seized from his home. These included an internal document with regard to the workings of the conspiracy, Segarra's July 1984 notes on the planning of the robbery, and Avelino Gonzalez–Claudio's letter on the planning of the March 1984 money move. Copies of Segarra's notes were also found at the homes of Ramirez and Avelino Gonzalez–Claudio. At Maldonado's home, these two documents were found in a file cabinet as part of a group of nine documents entitled "Compendium Of Most Relevant Documents." This compendium was essentially a collection of viewpoints reflecting an internal dispute over how to use and distribute the proceeds of the robbery. In addition, in Maldonado's brief case were found, *inter alia,* minutes of four meetings chaired by Maldonado, showing discussions and analysis of the conspiratorial group's finances, various secret projects, and "safe houses." Also found in the brief case were financial ledgers showing, *inter alia,* that Maldonado received a salary from the organization. Duplicates of some of these ledgers were also seized from the home of Ojeda–Rios's secretary, who acted as bookkeeper for the organization. Another ledger seized from the latter location showed both a December 1984 entry (which was contemporaneous with the planning of the Three Kings' Day celebration) of $7,500 expended for a "fiesta" and a $6,000 entry of payment to Maldonado for "A.B.", *i.e.,* Aguila Blanca, the Wells Fargo robbery. Searches of other residences yielded other documents evidencing Maldonado's participation in the conspiracy, including a document relating to the payment of insurance money to Weinberg in connection with the August 1984 truck-trailer accident in Pennsylvania. Maldonado's fingerprints were on this document.

Electronic surveillance also indicated, *inter alia,* that Maldonado knew Gerena by his code name Aguila and that he discussed with Ojeda–Rios such matters as the possibility that the coconspirators were the targets of surveillance, and investment of the robbery proceeds in certificates of deposit.

The Los Macheteros October 1984 communiqué announcing the group's responsibility for the Wells Fargo robbery noted that no prior announcement had been made because the group had "needed a total guarantee of confidentiality with regard to those who carried it out." The evidence indicated that Maldonado, in addition to having participated directly in one money move, had been entrusted with details as to all phases long before the organization felt it safe to admit its responsibility for the operation to outsiders.

Viewing the evidence as a whole rather than piecemeal, and drawing all inferences in favor of the government, the jury was entitled to conclude beyond a reasonable doubt that Maldonado was a knowing member of the conspiracy charged in count 16.

### E. *Segarra's Double Jeopardy Contentions*

Segarra was convicted, on an aiding and abetting theory, on, *inter alia,* four counts of robbery of federally insured banks, in violation of 18 U.S.C. § 2113, one count of theft from an interstate shipment, in violation of 18 U.S.C. § 659, and one count of obstructing interstate commerce through robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951. With respect to these three groups of substantive offenses, Segarra was given nonconcurrent groups of sentences of 20 years on the § 2113 counts, 10 years on the § 659 count, and 20 years on the § 1951 substantive count. In addition, he was convicted on two counts of conspiracy, *i.e.,* the Hobbs Act conspiracy to obstruct interstate commerce through robbery, in violation of § 1951, and the general conspiracy to commit bank robbery and transport the proceeds in interstate and foreign commerce, in violation of 18 U.S.C. § 371. With respect to these two conspiracy violations, Segarra was given consecu-

tive sentences of 20 years on the Hobbs Act conspiracy (which was concurrent with the 20 years imposed for the substantive Hobbs Act conviction), and five years on the § 371 conspiracy. On this appeal, he contends that his right to avoid double jeopardy was violated by (a) the dual conviction and consecutive sentencing under §§ 1951 and 659, (b) the consecutive sentencing under §§ 1951 and 2113, and (c) the consecutive sentencing on the two conspiracy counts. Only the first of these contentions has merit.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. amend. V. This provision "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The permissibility of multiple punishments for the same conduct, however, depends entirely on the intent of the legislature. "Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981).

In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court laid down a rule of statutory construction "to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). The *Blockburger* Court set forth the following test:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine wether there are two offenses or only

one, is whether each provision requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. at 304, 52 S.Ct. at 182. The Supreme Court's recent decision in *Grady v. Corbin*, — U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which held that a more extensive double jeopardy test is to be applied where there are successive prosecutions, appears to confirm that the *Blockburger* test remains the proper standard for assessing the validity of multiple punishments in the same prosecution. The *Corbin* Court described the *Blockburger* test as "a 'rule of statutory construction,' a guide to determining whether the legislature intended multiple punishments," *id.* 110 S.Ct. at 2091; and in ruling that a broader test was applicable to successive prosecutions, the Court took evident care not to rule that this broader test was to be applied to multiple punishments in a single prosecution, *see id.* 110 S.Ct. at 2090–93.

▆▆▆ As this Court has interpreted *Blockburger* and *Albernaz v. United States*, 450 U.S. at 336–42, 101 S.Ct. at 1140–44, the question of whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions is explored in a three-step inquiry. First, the language of the provisions must be analyzed. If the two offenses charged are set forth in separate statutes or in different sections of one statute or in different parts of a section, and each clearly authorizes a punishment for the violation of that provision, it will ordinarily be inferred that Congress intended to authorize punishment under each provision. Second, the *Blockburger* test, *i.e.*, whether each provision requires proof of a fact that the other does not, is employed to ascertain whether the inference that Congress intended multiple punishments is a reasonable one. If the *Blockburger* test is satisfied, it may be presumed that multiple punishments are authorized. Finally, this presumption is tested against the legislative history of the applicable provisions to be sure there is no indication of a contrary congressional intent. *See, United States v. Nakashian,* 820 F.2d at 553; *United States v. Marrale,* 695 F.2d at 662–63 (no

double jeopardy violation in convictions and sentencing under 18 U.S.C. §§ 659 and 2113).

With this analytical framework in mind, we consider each of Segarra's contentions.

1. Conviction and Sentencing for Theft from Interstate Commerce and the Substantive Hobbs Act Offense: §§ 659 and 1951

▆▆▆ A comparison of §§ 659 and 1951 reveals a great deal of similarity. Section 659, to the extent pertinent here, provides that

[w]hoever ... steals ... any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property ...

. . . .

[s]hall ... be fined not more than $5,000 or imprisoned not more than ten years, or both. . . .

18 U.S.C. § 659. Section 1951 provides, in pertinent part, that

[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery ... or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Though plainly they are separate sections and they appear in different chapters of Title 18, both sections define as an offense the theft of property moving in interstate commerce. Insofar as a substantive charge of such theft is made, neither section appears to require proof of a fact that the other does not. In *United States v. DiGeronimo*, 598 F.2d 746, 750 (2d Cir.), *cert. denied*, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979), in which we held that a defendant could not be convicted both of robbing a bank and of receiving or possessing the proceeds from that robbery, we noted that a charge of theft in violation of § 1951 was a "functional substitute" for a charge of theft in violation of § 659. On the present appeal, the government concedes that in light of

*DiGeronimo*, it was impermissible to sentence Segarra to consecutive terms under §§ 659 and 1951. It therefore concedes that the 10–year sentence imposed for violation of § 659 should be vacated.

▬▬▬ We agree that *DiGeronimo* is controlling, and we conclude that here, as in *DiGeronimo*, one of the convictions must be vacated. There is, however, one difference between this case and *DiGeronimo*, in that the two counts in *DiGeronimo* focused on sequential conduct—robbery, followed by receipt or possession of the property stolen in that robbery—as to which we inferred Congress intended only one punishment. We concluded in *DiGeronimo* that the proper method for submission of those counts to the jury was conditionally sequential: only if the jury found the defendants not guilty of robbery should it consider the charge of receipt or possession of stolen property; if the jury found the defendants guilty of robbery, it could not consider the receipt-or-possession charge. Since the robbery charge logically took precedence and the jury convicted on both counts, it was evident as a matter of principle that the conviction to be vacated was the conviction for receipt or possession. In the present case, the §§ 659 and 1951 counts of theft from interstate commerce focus on precisely the same conduct and do not pass the *Blockburger* test, and hence are multiplicitous. *See, e.g., United States v. Nakashian*, 820 F.2d at 552. Thus, the jury should not have been asked to consider both counts, even on a conditionally sequential basis; rather, the government should have been required to elect which count was to be submitted to the jury. Since that election was not made during the proceedings below, we accept the government's election here that the conviction under § 659 be the one to be vacated.

2. Sentencing for Bank Robbery and the Substantive Hobbs Act Offense: §§ 2113 and 1951

▬▬▬ As set forth in the preceding discussion, § 1951 makes it unlawful to obstruct the movement of any article in interstate commerce by robbery. Section 2113(a) has a somewhat different thrust. It provides, in pertinent part, that

[w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; ...

. . . .

[s]hall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(a). The term "bank" is defined, in pertinent part, as a member of the Federal Reserve System, or a banking institution organized under the laws of the United States, or an institution whose deposits are insured by the Federal Deposit Insurance Corporation. *See* 18 U.S.C. § 2113(f). Using the three-step inquiry discussed above, we cannot conclude that the Double Jeopardy Clause prohibits punishment under both § 1951 and § 2113.

First, the prohibitions are set out in different statutory provisions. Located in different chapters of Title 18, entitled "Racketeering" and "Robbery and Burglary," respectively, each section states a penalty for its violation. It is thus initially inferable that Congress intended that conduct violating both sections be punished under each.

Second, to establish a violation under either section, the government must prove a fact that is not needed for violation of the other. To establish a violation of § 2113, the government must prove, *inter alia*, that the property stolen was property in the custody or control, etc., of a federal bank, or a member of the Federal Reserve System, or a federally insured bank. Proof of this fact is not needed to establish a violation of § 1951. For proof of the latter, the government is required to prove, *inter alia*, that the robbery affected interstate commerce—a requirement not found in § 2113. Thus, §§ 1951 and 2113 meet the *Blockburger* test, for each requires proof of a fact that the other does not.

Finally, the legislative history of the two sections indicates that Congress was focusing on two distinct problems. In enacting § 1951, Congress's principal concern was protecting the flow of interstate commerce. *See, e.g., United States v. Culbert,* 435 U.S. 371, 377, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978) (purpose of Hobbs Act bill was " 'to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion' ") (quoting H.R.Rep. No. 238, 79th Cong., 1st Sess. 9 (1945)). In contrast, in enacting § 2113, Congress's principal concern was to find a means of " 'protect[ing] the institutions in which [the Federal Government] is interested.' " *United States v. Marrale,* 695 F.2d at 664 (quoting H.R.Rep. No. 1461, 73d Cong., 2d Sess. 2 (1934)). Thus, in *Marrale,* we noted that "although the legislative history of § 2113 contains a passing reference to the fact that bank robbery was often committed by organized gangsters who fled across state lines, ... the Congressional debates centered on how best to protect federal banks, not on how to protect interstate or foreign commerce...." 695 F.2d at 664.

These distinct legislative goals confirm the presumption that Congress intended multiple punishments under these two sections. We therefore reject Segarra's contention that the imposition of punishment for convictions under both § 1951 and § 2113 was precluded by the Double Jeopardy Clause.

### 3. The § 371 and Hobbs Act Conspiracy Sentences

For like reasons, we find no greater merit in Segarra's double jeopardy challenge to the two sentences imposed for violation of the general conspiracy section, 18 U.S.C. § 371 and of the Hobbs Act conspiracy provision in 18 U.S.C. § 1951. As indicated above, § 1951 reaches any person who conspires to obstruct, delay, or affect the movement of any article or commodity in interstate commerce, and a punishment for that conspiracy is provided in that section. Section 371 provides in pertinent part as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371. Thus, the two sections, which appear in different chapters of 18 U.S.C., plainly set forth prohibited conduct, and each provides a punishment.

The *Blockburger* test is satisfied, for each section requires proof of a fact that the other does not. Section 1951 requires proof that the objective of the conspiracy was obstruction of the flow of commerce or an article in commerce. Such an objective need not be proven for a violation of § 371. Section 371, on the other hand, requires proof of an overt act in furtherance of the conspiracy. The government need not prove an overt act in order to establish a Hobbs Act conspiracy. *United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988).

Finally, we have seen no indication in the legislative history that Congress did not intend the imposition of multiple punishments for violations of these two conspiracy statutes. Though the essence of conspiracy is agreement, and the same agreement may serve to satisfy that element of both offenses, Congress may well wish to enhance the punishment for conspiracies involving certain types of goals or behavior. As the *Nakashian* court noted, "the very existence of specific conspiracy statutes may evince a legislative intent to authorize multiple punishments, since it indicates some legislative dissatisfaction with the punishment provided for in 18 U.S.C. § 371." 820 F.2d at 553. Thus, we have ruled in several cases that multiple punishments under § 371 and more specific conspiracy statutes are permissible. *See, e.g., United States v. Nakashian,* 820 F.2d at 553 (§ 371 conspiracy and conspiracy to import and distribute narcotics in violation of 21 U.S.C. §§ 963 and 846); *United States v. Barton,* 647 F.2d at 237 (§ 371

conspiracy and RICO conspiracy in violation of 18 U.S.C. § 1962(d)); *see also, United States v. Thomas*, 757 F.2d 1359, 1369–71 (2d Cir.) (finding two specific conspiracy statutes, 18 U.S.C. § 1962(d) and 21 U.S.C. § 846, to be nonmultiplicitous), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). We have found in the legislative history nothing to suggest that Congress's provision in the Hobbs Act for a more severe penalty than then existed in § 371 for other conspiracies did not bespeak an intent that both penalties be imposed if all of the elements of both sections were proven.

Segarra urges us to adopt instead the view advanced in *United States v. Mori*, 444 F.2d 240, 244 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971), that "a single agreement ... constitute[s] a single offense subject to a single punishment." We decline to do so. This Court has already rejected the *Mori* view, noting that *Mori* was decided prior to the Supreme Court's decision in *Albernaz v. United States*, 450 U.S. at 336–42, 101 S.Ct. at 1140–44, and is contrary to the test used in this Circuit. *See United States v. Nakashian*, 820 F.2d at 554.

In sum, application of this Circuit's three-step test leads to the conclusion that Congress intended the imposition of dual punishments for violations of §§ 371 and 1951.

## CONCLUSION

We have considered all of appellants' contentions on these appeals and, with the exception of Segarra's challenge to his convictions and sentences on the § 659 and Hobbs Act substantive counts, we have found them to be without merit. We remand to the district court for vacation of Segarra's conviction and sentence under 18 U.S.C. § 659. In all other respects, the judgments of conviction are affirmed.